**21 MAG 6425**

Approved: /s/ Elisha J. Kobre, by SDA with permission
         ─────────────────────────────────────
         ELISHA J. KOBRE
         Assistant United States Attorney

Before:  HONORABLE STEWART D. AARON
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - X
                                :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA        :
                                :   Violations of
         - v. -                 :   15 U.S.C. §§ 78j(b) & 78ff;
                                :   17 C.F.R. § 240.10b-5; 18
OFER ABARABANEL,                :   U.S.C. §§ 2, and 1343
                                :
         Defendant.             :   COUNTY OF OFFENSE:
                                :   New York
- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRANDY N. KING-GONZALEZ, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service ("USPIS") and charges as follows:

**COUNT ONE**
**(Securities Fraud)**

1.   From at least in or about 2018 through the present, in the Southern District of New York and elsewhere, OFER ABARBANEL, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed, and caused others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, ABARBANEL made false representations to

obtain and retain investments in a mutual fund he operated, and continues to operate, and misappropriated investor funds for uses inconsistent with his representations to investors and for his own benefit.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.  From at least in or about 2018 through the present, in the Southern District of New York and elsewhere, OFER ABARBANEL, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, ABARBANEL made false representations to obtain and retain investments in a mutual fund he operated, and continues to operate, and misappropriated investor funds for uses inconsistent with his representations to investors and for his own benefit including via interstate wires into the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.  I have been a Postal Inspector with the USPIS since approximately 2013.  I am currently assigned to a team responsible for investigating violations of the federal securities laws and related offenses.  I have participated in investigations of such offenses and have made and participated in arrests of individuals who have committed such offenses.

4.  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to records and other documents I have reviewed in the course of this investigation.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions and statements of others

are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Relevant Persons and Entities

5. At all times relevant to this Complaint:

    a. "Income Collecting 1-3 Months T-Bills Mutual Fund" is a mutual fund (the "Fund") registered in the Cayman Islands, which consists of multiple share classes listed on the NASDAQ market headquartered in New York City, including a share class listed under the symbol "GOVBX."[1] A particular entity serves as investment manager to the Fund (the "Investment Manager").

    b. OFER ABARABANEL, the defendant, is a citizen of Israel and, as of May 2021, a naturalized citizen of the United States, and currently resides in California. ABARBANEL holds a professional certification as a securities portfolio manager and advisor in Israel. According to certain SEC filings, ABARBANEL is a 17-year securities lending broker and expert who has advised many Israeli regulators, among them the Israel Tax Authority, with respect to stock loans, repurchase agreements and credit derivatives.

    c. From at least in or about 2016 until in or about early 2019, ABARBANEL also controlled a now deregistered mutual fund that traded under the NASDAQ symbol "STATX." From at least in or about 2014 through the present, ABARBANEL owned and controlled the investment adviser to STATX, which appears to be the same as or closely tied to the Investment Manager to the Fund.[2]

    d. From at least in or about January 2015 until in or about November 2016, a co-conspirator not named herein ("CC-1") served as Portfolio Manager of the investment adviser to STATX. CC-1 also served, from in or about 2016 through in or about

---

[1] The Fund is not registered with the United States Securities and Exchange Commission ("SEC").

[2] In particular, a prospectus for STATX dated March 2017 states that an entity named "New York Alaska ETF Management LLC" is the investment adviser for STATX, "Mr. Abarbanel owns 100% of the Adviser," and lists a particular address in Las Vegas, Nevada as the adviser's address (the "Nevada Address"). The Prospectus for the Fund states that the investment manager to the Fund is T-Bill Securities LLC "which is doing business as NY Alaska ETF Management," also located at the Nevada Address.

3

September 2017, as STATX's Deputy Compliance Officer.  At times in or about 2018, CC-1 owned, through a limited liability company he managed, substantial amounts of STATX.

       e.   CC-1 is also listed in certain SEC filings as "Managing Member" of an entity named "Institutional Syndication" ("IS") and, through at least in or about October 2018, as "Manager" of an entity named North American Liquidity Resources LLC ("NALR") (collectively, the "Counterparties").

       f.   The "Investor Group" is a group of investors which invested, from in or about March 2019 through in or about February 2021, more than $100 million in the GOVBX share class of the Fund through an investment advisory firm based in the United States that is registered with the SEC (the "Investment Advisor").  The Investment Advisor acted as a sub-advisor to a broker-dealer, which in turn manages investments on behalf of individual investors and mutual funds, among others.

### Summary of the Fraudulent Scheme

    6.   As set forth in more detail below, from at least in or about 2018 through the present, OFER ABARBANEL, the defendant, engaged in a scheme to defraud investors in the Fund.  ABARBANEL falsely represented to the Investment Advisor that investments by the Investor Group would be placed "primarily" in short-term United States Treasury Securities having maturities less than or equal to three months. Contrary to these representations, the vast majority of the Investor Group's funds were not invested in short-term treasuries.  Instead, immediately after the Investor Group's investment was received by the Fund, ABARBANEL and his confederates transferred the investor funds to counterparties controlled by or otherwise closely associated with ABARBANEL, for use, among other things, in trading not authorized by the Fund's offering documents and for the benefit of ABARBANEL and the counterparties.

    7.   OFER ABARBANEL, the defendant, further represented, that in order to enhance income, the Fund intended to invest in securities lending transactions as well as repurchase and reverse repurchase agreements.[3]  ABARBANEL represented, as to these transactions, that the Fund would receive, in its possession and control, safe and secure collateral, in the form of treasury

---

[3] A repurchase agreement, or "repo," is a short-term agreement to sell securities and to buy them back at a slightly higher price at a specific future date.  A reverse repurchase agreement, or "reverse repo," is a short-term agreement to purchase securities and to sell them back at a higher price at a specific future date.

4

securities that could be quickly liquidated in the event a counterparty defaulted on its obligations. ABARBANEL, however, failed to obtain for the Fund the promised collateral to secure the investments. Nonetheless, ABARBANEL repeatedly told the Investment Advisor, in substance, that the Fund had possession of the collateral.

8. In or about May and June 2021, OFER ABARBANEL, the defendant, failed to honor a redemption request by the Investor Group for all of its outstanding investment, totaling more than $100 million, instead placing conditions on the redemption that were contrary to the Fund's offering document and to the Fund's practices with respect to prior redemptions. More recently, on or about June 16, 2021, the Fund transferred more than $10 million in investor funds from the Fund to a personal brokerage account of an attorney working with the Fund.

### ABARBANEL's Solicitation of Investments from, and Misrepresentations to, the Investment Advisor

9. From my interview with an individual who is a principal of the Investment Advisor (the "Principal") and who is also the Chief Investment Officer ("CIO") and Chief Compliance Officer ("CCO") of the Investment Advisor, and from my review of a Private Prospectus dated February 1, 2019 for the Fund share class GOVBX, (the "Prospectus") which was provided to the Principal by OFER ABARABANEL, the defendant, I have learned the following:

    a. In or about April 2017, the Principal was introduced to OFER ABARABANEL, the defendant, as the manager of a mutual fund which traded under the NASDAQ symbol STATX. In the following months, ABARBANEL solicited the Principal to invest funds of the Principal's investment advisory clients in STATX. As ABARBANEL represented to the Principal, STATX's investment strategy was the purchase of U.S. treasury securities, securities lending, and certain other short-term loan transactions known as repurchase or reverse repurchase agreements. ABARBANEL represented to the Principal that, as to these transactions, STATX, through its custodian, would take possession of collateral that could be liquidated promptly in the event a counterparty defaulted. This representation was critical to the Principal because the investment risk would thereby be limited to a possible decrease in the value of the collateral (principal risk) and was not dependent on the financial position of the counterparty (credit risk). Based upon these and other representations by ABARABANEL, in or about 2017 and 2018, the Principal invested at least approximately $20

5

million of his investment advisory clients' funds in STATX.

   b.   In or about late 2018 ABARBANEL also reassured the Principal that the STATX investment was safe because even if a repurchase or reverse repurchase agreement counterparty fails to meet its obligations, STATX keeps the collateral, which consists of U.S. treasury securities.

   c.   Also in approximately late 2018, ABARBANEL told the Principal that he was closing STATX and establishing a fund with the same or a similar investment strategy, the Fund, which included several share classes including a share class that traded under the NASDAQ symbol GOVBX.  ABARBANEL described the new fund to the Principal as "STATX offshore."  ABARBANEL told the Principal, in substance, that the reason for substituting the Fund for STATX was to avoid paying certain fees to broker-dealers for making the fund available for purchase by investors.

   d.   By approximately late February 2019, the Principal redeemed the STATX investments made on behalf of his investment advisory clients, in contemplation of making an investment in GOXBX.

   e.   In or about February 2019, ABARBANEL provided the Principal with the Prospectus for GOVBX, after which the Principal ultimately agreed to invest, between in or about March 2019 and February 2021, in multiple tranches, more than $100 million in funds belonging to investment advisory clients.

   f.   The Prospectus describes the Fund's investment objective as "seek[ing] current income with preservation of capital and daily liquidity."  The Principal understood the Fund's "daily liquidity" objective as the ability of investors to cash out of the fund quickly.  This objective was an important part of the Principal's decision to invest his clients' money in the Fund.

   g.   In a section of the Prospectus titled "Principal Investment Strategies," the Prospectus states that "[u]nder normal market conditions, the Fund invests its net assets primarily . . . in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury, that have remaining maturities of greater than or equal to one month and less than three months."

   h.   The Prospectus further provides that "[i]n order to enhance income, the Fund intends to enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions . . ."  Furthermore, "[l]oans will be made only to a counterparty who," among other things, "provide[s] collateral,

6

which is secured to the price performance of either: (i) 100% units of mutual fund symbols: STATX or of this Fund or (ii) 102%-115% U.S. Treasury securities."

    i. The Prospectus described the potential counterparties to which the Fund may lend securities as "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies." Based upon this and other representations by ABARBANEL, the Principal understood that the counterparties would be large institutions of the type described in the Prospectus. ABARBANEL did not tell the Principal that the counterparties would be owned or controlled by anyone associated with ABARBANEL. Had the Principal known of ABARBANEL's control over, or close association with, the counterparties to Fund transactions, and without the Fund being in possession of the collateral, the Principal would not have invested with the Fund.

    j. As set forth in the Prospectus, the Fund was not authorized to make any investments or use investor funds other than as described therein, i.e., U.S. Treasury securities, securities lending, and repurchase and reverse repurchase agreements.

    k. As further described in the Prospectus, and crucial to the Principal's decision to invest in the Fund, the repurchase and reverse repurchase transactions both required that the Fund obtain possession and control of securities or collateral. Thus, "[r]epurchase transactions involve the purchase of securities with an agreement to resell the securities at an agreed-upon price, date and interest payment." The repurchase transaction contemplated that if a counterparty failed to repurchase the securities, the Fund would be able to "dispos[e]" or "liquidate . . . promptly" the securities in its possession.

    l. The Prospectus stated that "[r]everse repurchase transactions involve the sale of securities with an agreement to repurchase the securities at an agreed-upon price, date and interest payment in which proceeds (collateral) secured to the Fund with respect to reverse repurchase agreements will include either: (1) 100% units of mutual fund symbols: STATX or of this Fund or (2) 102%-115% U.S. Treasury securities." The Principal understood the reverse repurchase agreements described in the Prospectus as the lending by the Fund of short-term treasury securities with the counterparty providing collateral in the form of long-term treasury securities. As set forth in the Prospectus, the risk inherent in reverse repurchase transaction would be mitigated by the Fund's ability "to liquidate collateral promptly

in the event of a default." ABARBANEL repeatedly told the Principal, in substance, that the Fund had possession of the collateral in the form of treasury securities.

        m.    The Fund's assets, including any collateral to be held in connection with securities lending or repurchase or reverse repurchase agreements, were to be held with one of three named "custodians," each of which was a large financial institution.

        n.    The Prospectus provided that investments in the Fund could be redeemed "at the option of the Shareholder on any Business Day and at any amount" and need only be received by the Fund's administrator (the "Administrator") at least one business day prior to the relevant redemption day. For redemptions in excess of a certain amount, the Fund was permitted to redeem an investor in "readily marketable securities" as well as in cash.

        o.    Based upon the representations from ABARBANEL and in the Prospectus, from approximately in or about March 2019 through February 2021, the Principal, on behalf of the Investor Group, invested a total of approximately $190 million in GOVBX. As of June 2021, following various redemptions during the same period, the Investor Group had approximately $106 million invested in the Fund.

        p.    ABARBANEL was the Principal's only point of contact at the Fund. In or about November 2020, the Principal asked ABARBANEL how a different investment fund compared with GOVBX. ABARBANEL replied, in substance and in part, that the other investment was inferior because their "[t]heir repo activity is allowed to be collateralized by JUNK Bonds(!!!)." The Principal understood this comment as ABARBANEL contrasting the poor collateral offered by the other fund with the safe and liquid U.S. Treasury collateral obtained by the Fund in its transactions.

### The Counterparties Were Shell Companies Used by ABARBANEL and CC-1 to Facilitate the Scheme

    10.    Contrary to the representations by OFER ABARBANEL, the defendant, and CC-1, the Fund did not receive the promised collateral. Instead, as set forth below, ABARBANEL used shell entities he controlled, together with CC-1, as counterparties to avoid the obligation to provide the designated collateral to the Fund, and to conceal from investors that the Fund was providing large sums of cash to the Counterparties without receiving the collateral identified in the Prospectus to secure those loans. Through these means, ABARBANEL and his confederates used investor

money to trade for their own benefit.

11. From SEC Forms D[4] filed by the Counterparties, a review of internet search sites, bank and brokerage records, and e-mails and text messages obtained during the course of this investigation, I have learned the following:

Institutional Syndication

    a. A niece of OFER ABARBANEL, the defendant (the "Niece"), who was in her mid-20s, was listed as an authorized signer on a bank account in the name of IS. Statements for this account were sent to an address associated with CC-1. CC-1 and the Niece were listed as authorized signers on brokerage accounts in the name of the IS. From my review of an e-mail dated October 18, 2017, I have learned that ABARBANEL advised CC-1 how to respond to a request from a broker for information needed to set up a brokerage account for IS.

    b. In a Form D filed with the SEC by IS on or about October 16, 2018 IS's principal place of business is listed as a location in Hazlet, New Jersey. This location appears to be a single-family house in a residential area. In another Form D filed with the SEC by IS on or about December 13, 2018 IS's principal place of business is listed as a location in Mt. Laurel, New Jersey. This location appears to be a virtual office.

North American Liquidity Resources, LLC

    c. The Niece was listed as an authorized signer on a bank account in the name of NALR. CC-1 and the Niece were also listed as authorized signers on brokerage accounts in the names of the NALR.

    d. From my review of messages provided by a part-time bookkeeper hired by ABARBANEL in or about 2017 to perform bookkeeping for, among other entities, NALR (the "Bookkeeper"), I have learned that the Bookkeeper repeatedly sought, and received, ABARBANEL's authorization to conduct wire transfers from a bank account in the name of NALR (the "NALR Bank Account") to a brokerage account in the name of NALR (the "NALR Brokerage

---

[4] A Form D is an SEC form used to file a notice of an exempt offering of securities under the SEC's Regulation D. SEC rules require the notice to be filed by companies and funds that have sold securities without registration under the Securities Act of 1933 in an offering based on a claim of exemption under Rule 504, 505 or 506 of Regulation D or Section 4(6) of that statute.

Account"), including wire transfers of the Investors' investment funds described below.

  e. In a Form D filed with the SEC by NALR on or about October 5, 2018, NALR's listed principal place of business is a location in Staten Island. This location appears to be retail space. The same form lists CC-1 as NALR's manager and sole related person. In a Form D filed with the SEC by NALR on or about December 13, 2018, NALR's principal place of business is listed as a location in Las Vegas, Nevada. This location appears to be a virtual office. The same form lists another individual (the "NALR Administrator") as NALR's manager and sole related person. From my interview with the NALR Administrator, I have learned that CC-1 hired the NALR Administrator, who has no experience in the securities industry, to perform recordkeeping and bookkeeping services for NALR. The NALR Administrator understood that the transactions by NALR were of ABARBANEL's money.

### ABARBANEL's Misuse and Misappropriation of the Investor Group's Funds

 12. From bank records, brokerage records, e-mails obtained during the course of this investigation, messages provided by the Bookkeeper, and from an interview with the NALR Administrator, I have learned that OFER ABARBANEL, the defendant, did not invest the Investor Group's money as promised. Rather, ABARBANEL together with CC-1 transferred at least $104 million of the Investor Group's investment to the Counterparties soon after those investors were received in exchange for an unsecured and uncollateralized loan agreement, titled the "Master Securities Loan Agreement," executed by the Counterparties. The Counterparties, at ABARBANEL's and CC-1's direction then transferred or used the investor funds in manners not consisted with ABARBANEL's representations to the Principal in the Prospectus and orally. The following are examples of this misuse of the Investor Group's funds:

  a. On or about March 5, 2019, the Investor Group wired $20,500,000, through a bank located in New York, New York, into a bank account in the name of the Fund (the "Fund Bank Account").[5] [6]

---

[5] The application form provided by the Fund for this investment stated that a redemption would be made through a particular bank located in Manhattan.

[6] While ABARBANEL was not an authorized signer on the Fund Bank Account, ABARBANEL's control over the Fund is evidenced, among other things, by his interactions with the Principal described herein, his interactions with the Bookkeeper described herein

10

On that same day, the entirety of that amount was transferred to the NALR Bank Account. On or about that same day, ABARBANEL and CC-1 directed NALR to execute a loan agreement with the Fund, the Master Securities Loan Agreement, but did not return any Treasuries or any other form of the required collateral to the Fund. On that same day, ABARBANEL directed the entire $20,500,000 from the NALR Bank Account to the NALR Brokerage Account. This transfer was routed through a bank located in New York, New York. These funds were then used to purchase Treasury securities in approximately the same amount. Those securities were held by, and for the benefit of NALR, not for the benefit of the Fund or the Investor Group and were not transferred to the Fund's custodians as collateral for the underlying unsecured loan agreement between the Fund and NALR.

   b. On or about June 27, 2019, the Investor Group wired $16,000,000 into the Fund Bank Account. On that same day, the entirety of that amount was transferred to the NALR Bank Account. On or about that same day, ABARBANEL and CC-1 directed NALR to re-execute the Master Loan Servicing Agreement to add the additional loan amount, but did not return any Treasuries or any other form of the required collateral to the Fund. On that same day, ABARBANEL directed the transfer of $16,000,000 from the NALR Bank Account to the NALR Brokerage Account. This transfer was routed through a bank located in New York, New York. These funds were then used to purchase Treasury securities in approximately the same amount. Those securities were held by, and for the benefit of NALR, not for the benefit of the Fund or the Investor Group and were not transferred to the Fund's custodians as collateral for the underlying unsecured loan agreement between the Fund and NALR.

   c. On or about September 4, 2020, the Investor Group wired $14,000,000 into the Fund Bank Account. On that same day, to the entirety of that amount was transferred to the NALR Bank Account. On or about that same day, ABARBANEL and CC-1 directed and caused NALR to re-execute the Master Loan Servicing Agreement to add the additional loan amount, but did not return any Treasuries or any other form of the required collateral to the Fund. On that same day, ABARBANEL directed the transfer of

---

directing transfers of investor money, and through e-mails showing, among other things, ABARBANEL providing a revised Fund prospectus to the Fund's administrator, ABARBANEL requesting, from NASDAQ, a NASDAQ ticker symbol for the Fund, and an e-mail from ABARBANEL on or about March 18, 2019 stating that "I've closed the fund [STATX] in order to relaunch it again . . . This new fund expense structure will enable me to hire more people to answer the giant demand we have for our fund."

approximately $14,000,000 from the NALR Bank Account to the NALR Brokerage Account. This transfer was routed through a bank located in New York, New York. These funds were then used to purchase Treasury securities in approximately the same amount. Those securities were held by, and for the benefit of NALR, not for the benefit of the Fund or the Investor Group and were not transferred to the Fund's custodians as collateral for the underlying unsecured loan agreement between the Fund and NALR.

13. Based upon my review of bank and brokerage records for the Counterparties and the Fund, and records for custodians listed in the Prospectus as the entities holding the Fund's assets, I do not believe the Counterparties transferred collateral to the Fund in the form required by the Prospectus.

14. Bank and brokerage records, and records obtained from the Bookkeeper, further reflect that from at least May 2019 through May 2021, OFER ABARBANEL, the defendant, directed the transfer of at least approximately $700,000 from the Fund Bank Account into accounts controlled by ABARBANEL. As an example, on or about September 5, 2019, a request for an outgoing wire in the amount of $17,224.22 from the Fund Bank Account to the account of a particular limited liability corporation ("ABARBANEL LLC-1") was e-mailed to a nominee for the Fund. The following day, the Bookkeeper sent a message to ABARBANEL with a screenshot showing a prepared but not yet authorized wire in the same amount from ABARBANEL LLC-1 to an account in the name of another limited liability corporation ("ABARBANEL LLC-2") for which ABARBANEL was the authorized signer, stating "Payment to you. [ABARBANEL LLC-1] to [ABARBANEL LLC-2]." ABARBANEL replied "yee," which I believe was intended to be "yes."

### After ABARBANEL Receives a Subpoena From the SEC, the Fund Forcibly Redeems All Investors Other Than the Investor Group

15. From records provided by the Administrator to the Fund, I have learned that, in or about late February 2021, the SEC issued a subpoena to, among others, OFER ABARBANEL, the defendant, seeking, among other things, records relating to the Fund. In response, and among other things, the Fund closed all share classes "with the exception of the biggest share class with the highest return (Symbol: GOVBX)."

16. A letter to shareholders in the Fund dated on or about March 3, 2021 states that the "GOVBX share class will remain active since its shareholders have already conducted and completed an extensive due diligence process . . ." According to the Fund's annual report for the year ended December 31, 2020, as of the end

12

of 2020, the share class GOVBX constituted more than 75% of the investments in the Fund. In particular, GOVBX listed net assets as of that date of $128,280,976 out of a total net assets for the Fund of $169,952,515.

### ABARBANEL Refuses to Redeem the Investors and Admits that the Investors' Funds are Not Available

17. Based upon, among other things, my review of documents and correspondence provided by the Investment Advisor and counsel to the Investor Group ("Investor Group Counsel"), I have learned that OFER ABARBANEL, the defendant, has not honored the Investor Group's redemption request, but has rather imposed conditions on the redemption not consistent with the terms of the Prospectus, as follows:

    a. On or about May 21, 2021, the Investor Group requested a full redemption of its shares in the Fund per the redemption terms in the Prospectus. At that time, the Investor Group had approximately $106 million invested in the Fund. As set forth above, according to the terms of the Prospectus, "[f]und shares are available for daily redemption" and "[s]hares will be redeemable at the option of the Shareholder on any Business Day and at any amount."

    b. Despite these provisions, ABARBANEL failed to honor the Investor Group's redemption request. On or about May 27, 2021, ABARBANEL and the Fund, through counsel, sent a PowerPoint presentation (the "PowerPoint") by email to Investor Group Counsel stating, in substance, that not all of the Investors funds were available, and that a full redemption was not possible. They claimed that the Fund at that time was holding approximately $88.9 million "sitting in cash" and an additional $25.9 million in cash and Treasuries that "are still invested in lending agreement[s]," and not able to be liquidated.

    c. In the PowerPoint, and in a telephone conversation held that day in which ABARBANEL discussed the PowerPoint, ABARBANEL attempted to pitch the Investor Group on a new investment vehicle set up by ABARBANEL, under which the Investor Group could redeem their shares in the Fund and immediately reinvest them with ABARBANEL in a different investment vehicle, rather than obtaining a full return of the funds in cash. The Investor Group declined ABARBANEL's offer and again requested a full return of their funds.

    d. Later on or about May 27, 2021, ABARBANEL demanded, as conditions on the Investor Group's redemption, that the Investor Group satisfy multiple requirements not listed in the Prospectus

as conditions for redemption. These include that the Investor Group complete a lengthy due diligence questionnaire, provide a "wet signature," and provide a listing of the net worth and identity of beneficial owners beyond the Investors and other requirements and "money laundering" protocols.[7]

   e. On or about June 1, 2021, ABARBANEL told the Investor Group Counsel that, to obtain a redemption, the Investor Group would need to sign a new agreement under which the Investor Group's redemption request would be satisfied by assigning it the Counterparties' accounts and "future cash flow" from the Fund's lending agreements with the Counterparties—i.e., the very lending agreements ABARBANEL had improperly entered into contrary to the terms of the Prospectus.

### The Fund Wires $10 Million to the Personal Brokerage Account of the Fund's Counsel and Compliance Officer

18. On or about June 16, 2021, a wire transfer in the amount of $10 million was made from the Fund Bank Account to a personal individual brokerage account in the name of an attorney who represented himself to the Investor Group Counsel as general counsel to the Fund (the "Fund Attorney").[8]

---

[7] The preconditions to redemption demanded by ABARBANEL are contrary, not only to the terms of the Prospectus, but also to ABARBANEL's handling of earlier redemption requests. For example, on or about March 11, 2021, the Investors submitted a redemption request for $75,000,000 from the Fund by simply filling out a redemption request form downloaded from the Fund website. The Fund did not require, at that time, require any additional information, a lengthy questionnaire, a "wet signature," or any money laundering "protocols" to honor that prior redemption.

[8] The Fund Attorney was also listed in an August 2020 version of the Fund Prospectus as "[l]egal Counsel and Anti Money Laundering Compliance Officer."

/s/ Brandy King-Gonzalez, by SDA with permission
_____
BRANDY KING-GONZALEZ
Postal Inspector
United States Postal Inspection
Service

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
23rd day of June, 2021

_____
HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15