**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATED OF AMERICA**

       **- v. -**

**OFER ABARBANEL,**

       **Defendant.**

**No. 21-Cr.-532-LAK**

---

**SENTENCING MEMORANDUM ON BEHALF OF**
**OFER ABARBANEL**

**Glen G. McGorty**
**Nimi H. Aviad**
**Jeffrey M. Severson**
**CROWELL & MORING LLP**
**590 Madison Avenue**
**New York, NY 10022**
**(212) 223-4000**

*Counsel to Ofer Abarbanel*

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................................... 1

II.  PROCEDURAL HISTORY ............................................................................................... 2

III.  MR. ABARBANEL'S PERSONAL BACKGROUND AND CHARACTER ...................... 3

   A.  Family Background ................................................................................................ 3

   B.  Mr. Abarbanel's Youth and Education .................................................................. 4

   C.  Israeli Military Service .......................................................................................... 5

   D.  Early Career Development ..................................................................................... 6

   E.  Working with Israeli Regulators ........................................................................... 7

   F.  Devotion to Family ............................................................................................... 9

   G.  ETFs and Mutual Fund Work .............................................................................. 12

   H.  Mr. Abarbanel's ████████████ ....................................................................... 12

IV.  SENTENCING CONSIDERATIONS ............................................................................. 13

   A.  The Offense Conduct and Plea Agreement .......................................................... 13

     1.  Offense Conduct ......................................................................................... 13

       a.  The structure of the Cayman Fund and the insufficient disclosures ..................... 14

         (i)  The purpose of the Cayman Fund was to earn enhanced returns for investors ...... 14

         (ii)  The disclosures to investors had key omissions ................................................... 15

       b.  Mr. Abarbanel did not act with the intent to harm investors ................................. 17

         (i)  Counsel was extensively involved in the Cayman Fund's strategy and disclosure language ........................................................................................................ 17

         (ii)  The Cayman Fund's attorneys reviewed and advised on its offering documents and disclosures ............................................................................................. 19

         (iii) While the Cayman Fund's disclosures were inadequate, it was never Mr. Abarbanel's intent to harm investors ....................................................................... 19

         (iv) The Cayman Fund's requirements surrounding redemption requests by the largest group of investors were not pretextual ......................................................... 21

     2.  The Applicable Sentencing Guidelines ....................................................... 23

   B.  The 3553(a) Factors ............................................................................................ 23

     1.  Mr. Abarbanel's Life and Character Counsel in Favor of Probation ............ 24

     2.  The Nature and Circumstances of the Offense Counsel in Favor of Probation ...... 28

     3.  A Probationary Sentence Fulfills the Sentencing Objectives Set Forth in 18 U.S.C § 3553(a)(2) ............................................................................... 31

       a.  A non-custodial sentence of probation with a substantial community service requirement reflects the seriousness of the offense, promotes respect for the law, and provides just punishment ...................................................................... 31

b.      A custodial sentence is not needed to afford adequate deterrence to criminal conduct .................................................................................................................. 33

V.   CONCLUSION.......................................................................................................... 36

EXHIBITS

Ex. 1   Abarbanel Personal Statement

Ex. 2   Tsvia Letter

Ex. 3   Berenstein Letter of Recommendation

Ex. 4   Keren Letter

Ex. 5   Elie Letter

Ex. 6   OH Letter

Ex. 7   ███████████

Ex. 8   Prospectus (USAO_SDNY_000015795 – USAO_SDNY_000015835)

Ex. 9   USAO_SDNY_0000033091.01160-61

Ex. 10   USAO_SDNY_0000535487

Ex. 11   USAO_SDNY_0000535210

Ex. 12   REV00138002-03

Ex. 13   REV00000033-34

Ex. 14   USAO_SDNY_0000033091.01381

Ex. 15   USAO_SDNY_0000033091.01400-03

Ex. 16   USAO_SDNY_0000538083

Ex. 17   ACCUVEST-SEC-0000181

Ex. 18   REV00150755-56

Ex. 19   USAO_SDNY_0001108662

Ex. 20   REV00000023

Ex. 21   REV00000071-73

Ex. 22   REV00000314-16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)................................................................23, 31

*Jamieson v. Sec. Am., Inc.*,
  No. 19 CV 1817 (VB), 2019 WL 6977126 (S.D.N.Y. Dec. 20, 2019)...................................34

*United States v. Adel*son,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).......................24

*United States v. Brady*,
  No. 02-CR-1043 (JG), 2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) ........................................31

*United States v. Eberhard*,
  No. 03 CR. 562-01 (RWS), 2005 WL 1384038 (S.D.N.Y June 9, 2005)...............................29

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014)...........................35

*United States v. Marino*,
  309 F. App'x 523 (2d Cir. 2009) ...........................................................29

*United States v. Nesbeth*,
  188 F. Supp. 3d 179 (E.D.N.Y. 25, 2016) ...........................................................32

*United States v. Nicholson*,
  638 F. App'x 40 (2d Cir. 2016) ...........................................................29

*United States v. Tagliaferri*,
  820 F.3d 568 (2d Cir. 2016)................................................................28, 33

*United States v. Vilar*,
  No. S305CR621KMK, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)....................................34

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)................................................................34

**Statutes**

18 U.S.C. § 3553(a) ...........................................................23, 24, 31

**Other Authorities**

Sentencing Transcript, *United States v. May*,
    No. 18 CR 880 VB (S.D.N.Y July 31, 2019), ECF 40 ...........................................................34

Sentencing Transcript, *United States v. Tagliaferri*,
    No. 13 CR 115 (RA) (S.D.N.Y Feb. 13, 2015), ECF No. 140 .........................................33, 34

Sentencing Transcript, *United States v. Vilar*,
    No. 05 CR 621 (S.D.N.Y. Feb. 5, 2010), ECF No. 956-5 .......................................................34

Through counsel, Ofer Abarbanel respectfully submits this memorandum and accompanying exhibits to assist the Court in determining an appropriate sentence.  Sentencing is scheduled for March 8, 2023.

## I.    PRELIMINARY STATEMENT

Ofer Abarbanel is a good man with a long history of accomplishment who, in a lapse of judgment, made a terrible mistake.  Over the course of 25 years, Mr. Abarbanel built a career in business and finance in which he founded and grew a number of successful companies.  In the process, he advised Israeli regulators on legislation and, for one company, secured an SEC rule change to ensure that its structure met the approval of regulatory authorities.  *See* PSR ⁋ 9.  *See also*, Ex. 1, Abarbanel Personal Statement at 4.  In 2018, he helped launch a mutual fund called the Income Collecting 1-3 Month T-Bills Mutual Fund (the "Cayman Fund").  *See* PSR ⁋ 8.  However, despite his unblemished and exemplary prior history, in the process of preparing the offering materials for the Cayman Fund, Mr. Abarbanel misrepresented how it would be structured and how it would function.  Those misrepresentations anchor Mr. Abarbanel's guilty plea to one count of investment advisor fraud.  Mr. Abarbanel now appears before this Court to be sentenced.

Through the following submission, Mr. Abarbanel attempts to provide the Court with a complete picture of his character and the conduct which led us all here.  Mr. Abarbanel also hopes to convey the following important message: he is immensely sorry for harm caused to the ultimate investors.  PSR ⁋ 45; Ex. 1, Abarbanel Personal Statement at 6.  He never intended to harm the investors in the Cayman Fund—and this is a marked difference between this case and many other fraud cases where the criminal defendant's goal is ultimately to permanently deprive a victim of their money.  Ex. 1, Abarbanel Personal Statement at 6.  Indeed, even in the original complaint and indictment (which we respectfully argue alleges criminal conduct far greater than

was substantiated by Mr. Abarbanel's guilty plea) there was no allegation that the Cayman Fund as structured was not a legitimate vehicle to generate income for investors and also preserve capital and daily liquidity.  And, for much of its existence, the Cayman Fund did exactly that.

In other words, this was no Ponzi or any other investment scheme that could never earn money for investors; the Cayman Fund was not created simply to enrich those who ran it.  Mr. Abarbanel did, however, make certain misjudgments about what to include in the Cayman Fund's Prospectus.  He did fail to inform investors that the Cayman Fund was not planning to purchase treasuries itself, but rather loan funds to counterparties for them to purchase treasuries, under a modified version of an industry standard lending agreement; and he did fail to inform investors that he was planning to supervise the subsequent trading by the counterparties meant to enhance the Cayman Fund's income.  As further described below, there were specific reasons for Mr. Abarbanel's conduct, but explanations are no excuse.  Mr. Abarbanel knows that it was wrong to deprive the Cayman Fund's investors of this information, and his recognition of his error is why he pled guilty.  But, because he has no criminal history, because his intent was never to harm his investors, and because his misjudgments were discrete, we respectfully submit that a sentence of probation, with a substantial community service component, and whatever other conditions the Court feels is appropriate, will serve the purposes of justice.

## II.    PROCEDURAL HISTORY

On June 23, 2021, the Government filed a criminal complaint charging Mr. Abarbanel with one count of securities fraud and one count of wire fraud in connection with Mr. Abarbanel's work for the Cayman Fund.  Mr. Abarbanel was arrested on June 24, 2021, and released on July 2, 2021, pursuant to conditions set by Magistrate Judge James L. Cott.  On August 23, 2021, the Government filed a criminal indictment, also charging Mr. Abarbanel with one count of securities fraud and one count of wire fraud.

During the course of the spring and summer of 2022, the Government thoughtfully considered presentations and submissions by defense counsel regarding the offense conduct, and had numerous meetings with defense counsel. On August 1, 2022, the defense moved to dismiss Count One of the Indictment and for an order suppressing evidence obtained from devices seized from Mr. Abarbanel. On September 7, 2022, after the parties reached a plea resolution, the Government filed a superseding information charging Mr. Abarbanel with one count of investment advisor fraud. On October 4, 2022, pursuant to a plea agreement with the Government, Mr. Abarbanel pleaded guilty before Magistrate Judge Ona T. Wang to one count of investment advisor fraud.

Mr. Abarbanel's sentencing is scheduled for March 8, 2023.

## III.   MR. ABARBANEL'S PERSONAL BACKGROUND AND CHARACTER

### A.   Family Background

Mr. Abarbanel was born in Tel Aviv, Israel on December 19, 1974. *See* PSR ¶ 67. He is the youngest of three children, with two older sisters: Carmit and Iris. *See Id.* ¶ 67. Mr. Abarbanel's father, David, is a holocaust survivor who was born in Libya, detained during the Second World War, and fled with his family to Israel when the war ended. Ex. 1, Abarbanel Personal Statement at 1. Mr. Abarbanel's mother, Tsvia, was born in Yemen and came to Israel as part of Operation Magic Carpet, when from June 1949 to September 1950 as many as 50,000 Yemeni Jews were transported to Israel to escape persecution. *Id.* at 1-2. In Israel, Mr. Abarbanel's father was a radiologist and an actor, as well as the founder of a construction company. PSR ¶ 68; Ex. 1, Abarbanel Personal Statement at 1. His mother was a jazz singer. PSR ¶ 68; Ex. 1, Abarbanel Personal Statement at 1.

Mr. Abarbanel was raised in Holon, Israel. PSR ¶ 68. Mr. Abarbanel's parents' backgrounds deeply impacted how they raised their family. Ex. 1, Abarbanel Personal Statement

at 2.  They were both high-achievers who taught their children to be self-aware and independent.

*Id.*  They encouraged the children to try everything, and then strongly supported the interests

their children developed.  *Id.*  They were affectionate, and taught their children to strive to be the

best that they could be.  *Id.*  Mr. Abarbanel felt that the nurturing, supportive environment that

his parents fostered allowed him to have a great childhood.  *Id.*  Mr. Abarbanel also developed a

strong sense of his Jewish identity while growing-up in Israel.  *Id.*  His family attended the

Achvah Temple during holidays, and had Sabbath dinners on Friday nights.  *Id.*

### B.      Mr. Abarbanel's Youth and Education

Mr. Abarbanel took his parents' guidance to heart.  He followed his interests and stayed

committed to them.  For instance, when Mr. Abarbanel was a boy he developed a passion for

rescuing animals.  Ex. 1, Abarbanel Personal Statement at 2.  His family's home was located

near sand dunes where people abandoned unwanted pets, and Mr. Abarbanel took in and cared

for abandoned pets in a large barn-like structure in the yard.  *Id.*  At one point, Mr. Abarbanel

was caring for twenty-two cats, three dogs, and two parrots.  *Id.*  Mr. Abarbanel's parents did not

interfere because he took full responsibility for caring for the animals, and sheltering these

animals helped Mr. Abarbanel develop empathy and a strong work ethic.  *Id.*

Mr. Abarbanel applied himself completely to whatever he did, which made him an

excellent student.  Ex. 2, Tsvia Letter at 1.  As he grew older, he became passionate about sports.

Ex. 1, Abarbanel Personal Statement at 2.  In particular, he enjoyed playing tennis and became a

top player in his age bracket.  *Id.*  He was talented and devoted enough that in high school he

asked his parents to allow him to attend the renowned Nick Bollettieri Tennis Academy owned

by sports & entertainment conglomerate IMG ("IMG Academy") in Bradenton, Florida, which

has produced tennis players such as Andrei Agassi, Monica Seles, and Anna Kournikova.  Ex. 2,

Tsvia Letter at 1.  *See also* Ex. 1, Abarbanel Personal Statement at 3.  Mr. Abarbanel's parents

recognized his drive, and allowed him to attend the IMG Academy beginning in the 10th grade, a highly unorthodox move for parents in Israel. PSR ⁋ 78. *See also* Ex. 1, Abarbanel Personal Statement at 3. At the IMG Academy, Mr. Abarbanel learned the discipline needed to thrive, and developed a rigorous routine. Ex. 1, Abarbanel Personal Statement at 3. He started every day at 5:30 AM with tennis practice, went through his school day, resumed tennis thereafter until dinner, and then returned to focus on homework until bedtime. *Id.* Mr. Abarbanel was thrilled to be part of this environment, because he felt that it allowed him the opportunity to be the best that he could be. *Id.*

### C.     Israeli Military Service

At the end of 11th grade, Mr. Abarbanel faced a difficult choice. Ex. 1, Abarbanel Personal Statement at 3. He was 18 years old, the age of mandatory military service in Israel. *Id.* He had to decide whether to stay at the IMG Academy or return to Israel to serve. *Id.* IMG Academy instructors wrote letters of recommendation for Mr. Abarbanel to play on the Israeli Davis Cup team, in the hope that he could both complete his military service and continue to play tennis. *Id.* Military authorities stated they would deny the request, but nonetheless gave Mr. Abarbanel a rare personal exemption to pursue his tennis career if he decided to stay in the U.S. Mr. Abarbanel could have taken this easy path, but he made the courageous choice to go back to Israel and serve his country rather than continue to train at the IMG Academy. Ex. 2, Tsvia Letter at 1. *See also* Ex. 1, Abarbanel Personal Statement at 3. Mr. Abarbanel felt particularly compelled to serve in the military after students from the Mitrani School, where Mr. Abarbanel attended 9th grade, were subject to a vicious terrorist attack. *Id.* As much as Mr.

Abarbanel wanted to continue to build his future in tennis—something for which he had worked so hard—he felt that serving his country took priority.  *Id.*

Mr. Abarbanel was drafted to the Israeli Military Police.  PSR ⁋ 82.  *See also* Ex. 1, Abarbanel Personal Statement at 3.  He first served in the Gaza Strip, when it was under Israeli control.  Ex. 1, Abarbanel Personal Statement at 3.  There he performed general reconnaissance and helped prevent drug and arms smuggling into and out of the Gaza Strip.  *Id.*  After Israel pulled out of the Gaza Strip, Mr. Abarbanel served in Military Police bases in the center of Israel.  *Id.*  Mr. Abarbanel was proud to serve Israel, but his time in the military mainly served to strengthen his belief that the way to solve conflicts is not through war and vengeance, but through empathy, and that understanding the suffering of others can create room for forgiveness and mutual growth.  *Id.*  After being so close to the conflict, Mr. Abarbanel was ready to build something positive.  *Id.*

### D.    Early Career Development

After completing his military service, Mr. Abarbanel worked at various security positions at Ben Gurion International Airport, a natural extension of his military training.  PSR ⁋ 82; Ex. 1, Abarbanel Personal Statement at 3.  While he enjoyed the work, he had greater aspirations and so he began to study for insurance, real estate, and capital markets licenses.  Ex. 1, Abarbanel Personal Statement at 3.

Mr. Abarbanel started as a salesman at Optima, an insurance and financial planning firm.  PSR ⁋ 81; Ex. 1, Abarbanel Personal Statement at 3.  He enjoyed two successful years there before he moved to DNR, where he performed similar work but on a freelance basis.  PSR ⁋ 81; Ex. 1, Abarbanel Personal Statement at 3.

After a year-and-half at DNR, Mr. Abarbanel decided to open his own firm, Contact Management and Consulting ("Contact Management" or "Contact").  PSR ⁋ 81; Ex. 1,

Abarbanel Personal Statement at 4.  He began with a small office and no employees, but six major clients which he obtained from cold calling and referrals.  Ex. 1, Abarbanel Personal Statement at 4.  Contact Management helped its customers obtain financing, and in the process of doing so Mr. Abarbanel developed relationships with a wide variety of international banks. *Id.*

In 2003, Contact began working with Clal Factoring, a subsidiary of Clal, which is a large Israeli insurance conglomerate.  *Id.*  Mr. Abarbanel's clients included large international companies such as Avis, Coca-Cola, Israeli Aircraft Industries, Office Depot, DHL, and Israeli Railways, but he had primarily worked with foreign banks.  *Id.*  Working with Clal allowed Mr. Abarbanel to grow his business and build relationships with foreign and Israeli banks, and it gave Clal greater access to loans and the ability to facilitate its expansion through international transactions.  *Id.*  This was consistent with how Mr. Abarbanel grew his career—seeking out new opportunities to gain additional experience and knowledge, and broadening his network in the process.  *Id.*

However, Mr. Abarbanel's early momentum suffered a major setback during the Great Credit Crisis and Recession of 2007-2008.  *Id.*  Mr. Abarbanel had been working with major international financial firms, including Lehman Brothers, and he lost the backing of those firms when the global banking industry faltered.  *Id.*  Mr. Abarbanel's business collapsed, and he returned to live with his parents.  *Id.*

### E.   Working with Israeli Regulators

After the collapse of Mr. Abarbanel's business, he began to envision how he could reinvent his career.  Ex. 1, Abarbanel Personal Statement at 4.  Mr. Abarbanel's experience at Contact had shown him that the laws and regulations that Israel used to monitor the securities industry were below global standards, and he wanted to continue his service to Israel by helping

to modernize them. *Id.* He studied the securities, tax, and financing laws and regulations of the United States and United Kingdom in order to understand better how to improve Israel's laws. *Id.* He contacted institutional authorities, held meetings with them, and assisted with developing legislation to prevent tax manipulation and tax avoidance in Israel. Ex. 1, Abarbanel Personal Statement at 4 and Ex. 3, Berenstein Letter of Recommendation.

He also helped develop laws that created regulatory approval for insurance companies and pension funds to conduct direct lending without involving Israeli banks or the Tel Aviv Stock Exchange; allowed credit derivatives to not be deemed insurance contracts, which meant that institutional investors could sell credit derivatives without an insurer license; and allowed Money Market Funds to transact at 0% bid-ask spreads. Ex. 1, Abarbanel Personal Statement at 4-5.

These changes were important because they helped modernize Israel's securities rules and regulations. *Id.* They made it easier for multi-national corporations to do business in Israel, and in the process strengthened the relationship between Israel and the global economy. *Id.*

Mr. Abarbanel earned no salary for his work with Israeli regulators, which consumed all of his time for a full year. *Id.* at 5. He did the work because he wanted Israel's rules and regulations to be consistent with other developed countries, and because he saw the opportunities available to him as an expert in the field. *Id.* Indeed, institutional investors and Israeli regulators sought out his expertise. *Id. See also* Ex. 3, Berenstein Letter of Recommendation. Mr. Abarbanel brought energy and drive to what appeared to be a set-back, and in the process left both himself and Israel better for his efforts. Ex. 1, Abarbanel Personal Statement at 4-5.

As the global economy began to recover, Mr. Abarbanel started another business— Contact Prime Brokerage. PSR ¶ 81. *See also* Ex. 1, Abarbanel Personal Statement at 5. He

shifted his focus from financing companies to financing hedge funds and pension funds.  Ex. 1,

Abarbanel Personal Statement at 5.  Mr. Abarbanel operated the business successfully for a

number of years, but in 2013 he decided he wanted to transition his career to money

management.  *Id.*  That transaction happened in the United States because of a fortuitous

personal development.  *Id.*

    **F.**    **Devotion to Family**

    By 2013, Mr. Abarbanel had spent his entire adult life devoted to work, and had

eschewed any long-term relationships.  Ex. 1, Abarbanel Personal Statement at 5.  But, as he

approached his late thirties, he started to realize that he wanted a family.  *Id.*  He joined JDate, a

Jewish online dating platform, and met Keren Aigen.  *Id.*  Keren was a divorced single mother of

two young boys who lived in Southern California and worked as a teacher.  Ex. 4, Keren Letter

at 1.  *See also* Ex. 1, Abarbanel Personal Statement at 5.  Her ex-husband had cruelly caused

Keren to doubt she could ever meet someone else, and she was resigned to a life without a

partner.  Ex. 4, Keren Letter at 1.  But, her pessimism proved unfounded when she met Mr.

Abarbanel after also joining JDate.

    Mr. Abarbanel and Keren forged an immediate connection.  *Id.*  Mr. Abarbanel embraced

Keren and her life in its entirety and welcomed the opportunity to be a part of her family.  *Id.*

After several months of communicating online, Mr. Abarbanel flew to Los Angeles to meet

Keren in person.  They spent several weeks together, and Keren knew right away that Mr.

Abarbanel was, in her words, her *b'shert* (a Yiddish term meaning a person who is one's

destiny).  Ex. 4, Keren Letter at 2.  Mr. Abarbanel spent a few months in Israel following the

trip, and then packed up his life and moved to Los Angeles to be with Keren and her two boys.

They married in 2015 surrounded by close friends and family.  PSR ⁋ 69.  *See also* Ex. 4, Keren

Letter at 2; Ex. 1, Abarbanel Personal Statement at 6.

Mr. Abarbanel was a steadying and supportive presence in the lives of Keren and her boys.  Ex. 5, Elie Letter at 1.  Mr. Abarbanel supported Keren in her career in education, telling her that if teaching was her passion she should continue, but she should no longer feel obligated to teach.  Ex. 4, Keren Letter at 2.  Before Mr. Abarbanel, Keren's family's finances had been precarious, but Mr. Abarbanel provided for the family and gave them much needed financial stability.  *Id.* at 1.

Nothing says more about Mr. Abarbanel's character than the way he has cared for Keren's boys, OH and Elie.  He "loves them with all [his] heart" and he has raised them as his own.[1]  Ex. 6, OH Letter at 5.  *See also* Ex. 1, Abarbanel Personal Statement at 5.  He has supported their education and paid their tuition at Valley Beth Shalom, Heschel Day, and de Toledo schools.  Ex. 6, OH Letter at 7.  *See also* Ex. 1, Abarbanel Personal Statement at 5-6.  He was present for them in ways their biological father never was; he was there for every parent-teacher conference, for every sporting event.  Ex. 4, Keren Letter at 2.  *See also* Ex. 1, Abarbanel Personal Statement at 6.  He is so close to the boys that one calls him his "best friend" and the other "baby."  Ex. 4, Keren Letter at 2.

Both boys have described to the Court what Mr. Abarbanel means to them and their family.  In his letter to the Court, Elie, the elder of the two boys, wrote that Mr. Abarbanel's commitment to his family "has been nothing short of everything" and Mr. Abarbanel "is the sole reason [his] family is still standing and thriving."  Ex. 5, Elie Letter at 1-2.  Mr. Abarbanel rescued the family from a financially precarious position and brought them security.  Mr. Abarbanel has also been the stable father figure that Elie felt he lacked.  *Id.* at 2.  Elie noted that Mr. Abarbanel taught him the importance of a "toolbox," meaning a set of mental tools to draw

---

[1] Mr. Abarbanel never formally adopted the boys because he did not want to subject them to a custody battle with their biological father, who had a contentious divorce from Keren.

upon in any circumstance.  *Id.*  Mr. Abarbanel instilled in Elie the values of "dependability, honesty and the love of learning."  *Id.*  Mr. Abarbanel is "a father, mentor, and the best friend [Elie] could ever have."  *Id.*  Elie "cannot express more how thankful and proud [he is] to call Ofer [his] father," and does not know what the family would do without Mr. Abarbanel.  *Id.*

OH, the younger of the two boys, recalled meeting Mr. Abarbanel when he was only five years old and how Mr. Abarbanel was a steadying and loving presence in the family's life.  Ex. 6, OH Letter at 1.  One of his best memories was of a family conversation about whether the family should have another child.  *Id.*  Mr. Abarbanel said, "I don't need to have a baby, I already have two amazing kids of my own."  *Id.*  Mr. Abarbanel was "always there" for OH.  *Id.* He was by OH's side as his bar mitzvah because "he's my real dad and I can't imagine any other father by my side at that moment."  *Id.* at 2.  Speaking to Mr. Abarbanel's role in the family, OH wrote that he "saved all of us, especially me."  *Id.*  Mr. Abarbanel "is an incredible role model, hard working, honest, and puts family first before anything.  Without Ofer, I would not be where I am today.  Ofer is the man that made me happy."  *Id.*

Mr. Abarbanel's devotion to Keren was never more important than in 2019, when Keren suffered a severe heart attack.  Ex. 4, Keren Letter at 2-3.  Mr. Abarbanel rushed her to the hospital, where the doctors told her she was lucky to be alive, and that she had several heart conditions, including heart disease.  *Id.* at 2.  Keren stayed in the hospital for 27 days, and Mr. Abarbanel was at her side every day; he would only leave briefly to check on the boys (who were being cared for by a relative).  *Id.* at 2-3.  He performed all of his work from the hospital, and slept on the lounge chair in a sleeping bag.  *Id.* at 3.  *See also* Ex. 5, Elie Letter at 2.  When Keren was released, Mr. Abarbanel was always there for her.  Ex. 4, Keren Letter at 3.  Since being in the hospital, Keren has developed a herniated disk in her back, and between that injury

and her heart condition she is unable to work.  *Id.*  This makes Mr. Abarbanel all the more invaluable to the family, as he is the sole provider for Keren, Elie, and OH.  *Id.  See also* Ex. 5, Elie Letter at 2.

Despite his deep devotion, Mr. Abarbanel's work sadly wore away at his relationship with Keren and in 2020, she filed for an amicable separation from Mr. Abarbanel, because he was "too involved" with his work.  Nonetheless, during the pandemic and the Government's investigation into the Cayman Fund, Mr. Abarbanel, Keren, Elie, and OH have continued to live together and function as a family unit.  In addition, since the beginning of the DOJ and SEC's investigations, Keren's family and all of Mr. Abarbanel and Keren's friends and acquaintances had abandoned them, making the four of them an even more tight-knit unit.  Ex. 2, Tsvia Letter at 2.  Regardless of whether Mr. Abarbanel and Keren stay together, Mr. Abarbanel is committed to the boys and will remain an important part of their lives.

### G.     ETFs and Mutual Fund Work

After Mr. Abarbanel moved to Los Angeles and began his life with Keren, Elie, and OH, he also started and worked with a number of businesses, including an exchange-traded fund ("ETF") and two mutual funds.  That portion of his career is relevant to the offense conduct, and is addressed more fully *infra*, in section IV.A

### H.     Mr. Abarbanel's ▮▮▮▮▮▮





\* \* \*

Mr. Abarbanel's life is defined by energy and dedication.  He devotes himself completely to everything that he does, whether that is the care of animals, or tennis, or his career; or whether it is service to Israel, or love for his family.  His goal is to succeed in whatever he does, not for any end reward but because his parents instilled in him the importance of being the best that he could be.  This is what brought Mr. Abarbanel success in the past, and this is what will see him through this difficult period.

## IV.    SENTENCING CONSIDERATIONS

### A.    The Offense Conduct and Plea Agreement

#### 1.    Offense Conduct

On September 7, 2022, Mr. Abarbanel entered a guilty plea to one count of investment advisor fraud.  He did so because he made material misrepresentations to investors in the offering materials of the Cayman Fund, a mutual fund he helped start.  Mr. Abarbanel profoundly regrets making these misrepresentations.  Mr. Abarbanel's criminal conduct is far narrower than the conduct the Government initially accused him of, and is far more limited than the conduct the Government described during the plea hearing or that was described in the initial

disclosure of the PSR.[2]  Most crucially, Mr. Abarbanel never acted with any intent to harm investors.

    a.    **The structure of the Cayman Fund and the insufficient disclosures**

    (i)    **The purpose of the Cayman Fund was to earn enhanced returns for investors**

The Cayman Fund was a mutual fund organized in the Cayman Islands.  Mr. Abarbanel served as a compliance officer and risk monitoring consultant to NY Alaska ETF Management LP, the investment advisor of the Cayman Fund.  He was not an employee of the Cayman Fund, and he did not own any portion of the Cayman Fund.  *See* Indictment ¶ 2 (ECF No. 12).  The Cayman Fund's stated investment objective was to seek income for its investors.  Ex. 8 (Prospectus at USAO_SDNY_000015796).  The Cayman Fund also identified preservation of capital and daily liquidity as its stated goals.  *Id.*  In order to fulfill its investment objectives, the Cayman Fund invested in short-term treasury securities and also engaged in securities lending transactions.  Because short-term treasuries are zero-coupon bonds that in 2018-2020 yielded mere basis-points, the securities lending transactions were aimed at enhancing returns consistent with the Cayman Fund's goal of seeking income for its investors.  *Id.*

The securities lending transactions were structured as follows:  When the Cayman Fund received cash from its investors, it lent it to two counterparties: Institutional Syndication LLC and North American Liquidity Resources LLC (jointly, the "Counterparties").  *See, e.g.*, Ex. 9 (USAO_SDNY_0000033091.01160-61).  The Counterparties used the cash to purchase short-term treasuries in the same amounts as the loans.  The loans themselves were governed by modified versions of industry-standard Master Securities Lending Agreements ("MSLAs"),

---

[2] At this time of this submission, Probation has not issued the final PSR.

which provided that the Cayman Fund would receive rights to the treasuries the Counterparties purchased as collateral for the loans. *Id.* Those collateral rights were augmented by floating UCC liens on all of the counterparties' assets, making the loans collateralized. *See* Exs. 10 and 11 (USAO_SDNY_0000535487 and USAO_SDNY_0000535210).

As disclosed in the Prospectus, the Counterparties then "reused" a part of the collateral (*i.e.* the treasury securities) for additional trading, *see* Ex. 8 (Prospectus at USAO_SDNY_000015797), and the income from this trading was used to pay the interest on the loans with the Cayman Fund. The interest payments on the loans allowed the Cayman Fund to pay the enhanced income to its investors that its name promised, which could not have been generated by investing in short-term treasuries alone. Mr. Abarbanel and the Cayman Fund, as creditors to the Counterparties and under advice of counsel, supervised the reuse trading in order to protect the investors' money. There are no allegations that there was anything illegal about the Cayman Fund's structure and business model. The crux of this case is that this structure was not disclosed to investors adequately and to that, Mr. Abarbanel has agreed, acknowledging his responsibility for this deficiency.

### (ii)  The disclosures to investors had key omissions

The structure and workings of the Cayman Fund was generally disclosed to investors via its Prospectus, as amended. For example, the Prospectus disclosed that:

- In order to enhance the Cayman Fund's income, it entered into securities lending transactions. Ex. 8 (Prospectus at USAO_SDNY_000015796) ("In order to enhance income, the Fund intends to enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees.").

- The collateral from the securities lending transactions was reused by counterparties. *Id.* at USAO_SDNY_000015797 ("The Fund seeks to maximize income from securities lending and reverse repurchase agreement transactions through entering into such transactions with counterparties who may reuse the securities obtained through securities lending and/or reverse repurchase agreements with the Fund to collateralize other transactions with different counterparties, their assets and/or their balance sheets.")

However, two key pieces of information were not disclosed in the Prospectus. Recognition of Mr. Abarbanel's failings in this regard prompted him to plead guilty. That information was that:

- Instead of purchasing treasuries and lending the treasuries to the Counterparties, the Cayman Fund lent the Counterparties cash at an amount equal to the price of treasuries (and the Counterparties purchased the treasuries). The Prospectus also did not say that the securities lending agreements at issue modified the industry-standard MSLAs to reflect this practice.

- Mr. Abarbanel closely supervised the securities lending transactions with the Counterparties and the Counterparties reuse of the collateral. In other words, Mr. Abarbanel's relationship with the Counterparties—a relationship which was designed entirely to ensure that their investments were properly managed—was not made clear in the Prospectus.

These omissions, as further explained below, were not born out of any intent to harm investors, or to enrich Mr. Abarbanel. They stemmed instead from misunderstandings on the applicability of certain legal advice that Mr. Abarbanel received, and Mr. Abarbanel's foolhardy belief that omitting certain information about the Cayman Fund's inner workings was justified

by his desire to not confuse or overwhelm the investors.  Mr. Abarbanel knew these were

omissions at the time he made them, and fully appreciated the way in which they deprived

investors of material information.  Mr. Abarbanel does not run from his errors, but asks the Court

to keep those errors in perspective: they are far from the nefarious scheme to harm investors

portrayed by the Government in the initial charging documents.

      b.     **Mr. Abarbanel did not act with the intent to harm investors**

      (i)     **Counsel was extensively involved in the Cayman Fund's strategy and disclosure language**

The fundamental strategy of the Cayman Fund—to purchase short term treasuries and

provide investors with both enhanced income and liquidity through securities lending

agreements—was originally developed for Plus Trust, an ETF that Mr. Abarbanel worked to

launch from 2014-2017, which never became active.  Much of the language in the Cayman

Fund's Prospectus was originally developed for Plus Trust.

When developing Plus Trust, attorneys from Dechert LLP advised Mr. Abarbanel

extensively.  For example, Dechert attorneys advised Mr. Abarbanel on the language for the Plus

Trust prospectus, and they exchanged drafts in which they wrote and revised the language for

that prospectus.  *See, e.g.*, Ex. 12 (REV00138002-03).

To ensure that the Plus Trust ETF's strategy was within the bounds of all rules and

regulations, the Dechert attorneys and Mr. Abarbanel worked with attorneys from NASDAQ to

file an SEC rule change, which was ultimately approved on September 24, 2015.[3]  The SEC rule

---

[3] The final rule is available at https://www.govinfo.gov/content/pkg/FR-2015-09-30/pdf/2015-24714.pdf.  Note that the rule change itself indicates it was NASDAQ who actually filed the rule change request ("On July 29, 2015, The NASDAQ Stock Market LLC . . . filed . . . a proposed rule change to list and trade shares ("Shares") of the 1-3 Month Enhanced Short Duration ETF ("Fund"), a series of Plus Trust ("Trust")."

largely tracked the language in the Plus Trust prospectus, and Plus Trust sought the rule change to clarify that collateral could be cash or debt instruments secured with a pledge on treasuries.

Mr. Abarbanel ultimately decided not to launch the fund because the way in which market makers would have asked for a bid-ask spread would have made the Plus Trust fund a bad investment (though Mr. Abarbanel would still likely have made money). Instead, Mr. Abarbanel pivoted his business model from an ETF to a mutual fund, called State Funds-Enhanced Ultra-Short Duration Mutual Fund ("State Funds"), and began to work with attorneys at Thompson Hine LLP to launch it. State Funds maintained the same investment strategy as Plus Trust, to purchase short-term treasuries and use securities lending transactions and collateral reuse to enhance income. Like Dechert, Thompson Hine advised State Funds and Mr. Abarbanel regarding its prospectus, and filed the prospectus with the SEC when State Funds launched. The language in the State Funds prospectus closely tracked the language from the Plus Trust prospectus

When Mr. Abarbanel wound down State Funds—with no loss to investors (including investors advised by Mosaic Financial Ltd. – the entity identified in the PSR as the victim)—and started working on the Cayman Fund, the Cayman Fund worked with attorneys Robert Lu and Kanika Green. Mr. Lu was principal U.S. counsel to the Cayman Fund and its chief AML officer. When Mr. Lu was retained, he had his own private practice, as well as an impressive resume which boasted of his service as a former federal prosecutor in the U.S. Attorney's Office in the District of Arizona and work at Latham & Watkins. Mr. Abarbanel believed, fairly, that Mr. Lu was well-qualified to advise the Cayman Fund. Kanika Green was an experienced Cayman Islands-based attorney who served as special counsel to the Cayman Fund. *See* Ex. 8

(Prospectus at USAO_SDNY_000015802-04) (summarizing Mr. Lu and Ms. Green's qualifications).

### (ii)    The Cayman Fund's attorneys reviewed and advised on its offering documents and disclosures

Both Mr. Lu and Ms. Green advised the Cayman Fund about its Prospectus, and the Prospectus' language again drew substantially from the prospectuses for Plus Trust and State Funds.  Ms. Green reviewed and filed the Prospectus with the Cayman Islands Monetary Authority ("CIMA").  *See* Ex. 13 (REV00000033-34).  Mr. Lu likewise reviewed and revised the Prospectus.  *See* Ex. 14 (USAO_SDNY_0000033091.01381); Ex. 15 (USAO_SDNY_0000033091.01400-03).  Mr. Abarbanel also understood that Mr. Lu was aware that, in securities lending transactions, the Cayman Fund lent cash tied to the price of treasuries, rather than buying treasuries and loaning the treasuries themselves.  *See* Ex. 9 (USAO_SDNY_0000033091.01160-61) (Mr. Abarbanel sends the MSLA to Mr. Lu, and the MSLA read: "Delivery of loan can be of a cash transfer tied to the market value of the respective Securities being lent as described in this page.").  In addition, in August 2017, when State Funds was active, State Funds and New York Alaska ETF Management LLC engaged K&L Gates.  Based on oral communications with counsel at K&L Gates, Mr. Abarbanel understood that loans could be collateralized using rights to treasuries and not necessary treasuries themselves.  This advice was reflected in the Prospectus, which provided that the Cayman Fund would have "contractual provisions which provide for the right to liquidate collateral promptly in the event of a default."  Ex. 8 (Prospectus at USAO_SDNY_000015798).

### (iii)    While the Cayman Fund's disclosures were inadequate, it was never Mr. Abarbanel's intent to harm investors

An unfortunate result of Mr. Abarbanel's use, over the course of several years, of multiple attorneys for multiple funds that were similarly, but not identically, structured was that

there were gaps where the advice Mr. Abarbanel received did not necessarily align with the way in which the Cayman Fund operated.  For example, regarding the Cayman Fund loaning cash rather than treasuries to the Counterparties, Mr. Abarbanel improperly pieced together advice from legal counsel, auditors, and others that wrongly led him to believe that there was no material difference between loaning cash and treasuries, and thus that the investors would not be harmed by his failure to disclose that the Cayman Fund lent cash rather than treasuries.

Likewise, Mr. Lu reviewed the MSLA that the Cayman Fund used, but the Cayman Fund Prospectus did not contain a disclosure indicating that the MSLA was modified and not the industry-standard form.  Despite the involvement of counsel, Mr. Abarbanel fully recognizes that the MSLA that was used was materially different than the industry-standard version, and he knowingly failed to advise investors accordingly.

Similarly, the Government and the initial disclosure of the PSR have implied that the securities lending transactions with the Counterparties were not arms-length transactions and this led to self-dealing.  This was not true; Mr. Abarbanel supervised the collateral reuse trading to ensure that the Counterparties did not lose money.  Mr. Abarbanel did not benefit materially from this control, and the control was for the benefit of the investors.  There was no intent to harm the investors, but Mr. Abarbanel acknowledges that the Cayman Fund should have disclosed this information, so that the investors could have made an informed decision regarding whether this information changed their decision to invest.

In the end, Mr. Abarbanel's disclosures in the Prospectus were insufficient to fully describe the relevant information needed by the investors to make informed decisions.  Mr. Abarbanel regrettably failed to make full disclosures not because he intended to harm investors or permanently deprive them of their money, but because he believed that the investors would

not understand the complexities of the transactions.  Mr. Abarbanel was confident that he knew better and would earn significant returns for the investors, so he did not feel more detail would do anything more than confuse the investors and delay the process of the investments.  This was a mistake, but it was not a mistake motivated by a desire to enrich himself at the expense of the investors.

### (iv)   The Cayman Fund's requirements surrounding redemption requests by the largest group of investors were not pretextual

During the plea hearing, the Government's recitation of trial proof included an allegation that Mr. Abarbanel "failed to honor a redemption request by the victims for the entirety of their outstanding investment, totaling more than $100 million.  Instead, placing conditions on the redemption that were contrary to the Fund's offering documents and to the Fund's practices with respect to prior redemptions," and that "[o]n or about June 16, 2021, the Fund transferred more than $10 million in investor funds from the Fund to a personal brokerage account of an attorney working with the Fund."  Plea hearing transcript at 25 (ECF No. 57).  The initial disclosure of the PSR made similar allegations.  While the defense respectfully contends that these allegations are not germane to the actual conduct to which Mr. Abarbanel pled guilty, they could be construed as a distinct act of wrongdoing, and so are addressed here.  Mr. Abarbanel did not plead to this allegation and the facts do not support it, as the conditions placed on the redemption by the Cayman Fund—all surrounding legitimate AML concerns—were well-founded.  Since the Government has elected to suggest that this issue demonstrated some wrong-doing on Mr. Abarbanel's part, it is imperative that the Court understand the complete set of facts.

In each investment request *and* each redemption request prior to the one highlighted by the Government, the Cayman Fund's largest investor—Mosaic Financial Ltd—had to fill out a form in which it confirmed that it had verified the identity of any beneficial owners of the shares,

and that the beneficial owners were citizens or residents of Israel or Mexico.  *See, e.g.*, Ex. 16

(USAO_SDNY_0000538083) (January 6, 2022 redemption form for shares that were fully

redeemed).  When Mosaic sought a full redemption, the Cayman Fund, under the advice of

counsel, sought additional assurances that Mosaic was making accurate representations, and

requested that they complete a "Wolfsburg questionnaire" which sought more detailed

information about Mosaic's beneficial owners.

The Cayman Fund's concerns were justified.  When Mosaic completed the Wolfsburg

questionnaire, it indicated that its beneficial owners were from Mexico, *Brazil*, *Argentina*, and

*Panama*—contrary to the certifications and representations that Mosaic had previously made to

the Cayman Fund.  *See* Exs. 17 and 18 (ACCUVEST-SEC-0000181 and REV00150755-56).

That Mosaic actively hid the identity of its investors from the Cayman Fund is also

supported by internal communications.  In one August 12, 2019 email, for example, Mosaic's

president and chief investment officer, wrote, "One quick thing I forgot to mention...with regard

to the new Cash + fund with Lourdes, we are not telling Ofer that she's the source of the $$.  We

are just opening up our own new fund like CST P, but we are having to build in distribution fees

for it.  That's all he should know, and her name should never come up in conversation."  *See* Ex.

19 (USAO_SDNY_0001108662).  The Cayman Fund's AML concerns were not just perceived;

they were real.

Moreover, the Cayman Fund's response to the redemption requests was conducted under

advice of counsel.  Mr. Lu was the AML officer for the Cayman Fund and his responsibilities

included "oversight of the fund's AML procedures and controls, both at the investor level and

the investment activities."  Ex. 20 (REV00000023).  Accordingly, he drafted and advised the

Cayman Fund on its communications with the Investors' attorneys at Walden Macht & Haran

LLP.  *See, e.g.*, Exs. 21 and 22 (REV00000071-73 and REV00000314-16).

When Mr. Abarbanel's assets were frozen on June 18, 2021, and he was arrested on June

24, 2021, it cut-off the Cayman Fund and the Investor's ongoing discussions about the potential

full redemption, and the Investor had not received $106 million of its investment.  However, they

did receive $87 million back as part of the liquidation process.  *See* PSR ¶ 49.[4]

### 2.    **The Applicable Sentencing Guidelines**

Pursuant to Mr. Abarbanel's Plea Agreement with the Government, and as calculated in

the initial disclosure of the PSR, the parties agree that the advisory Guidelines range is 87 to 108

months' imprisonment.  PSR ¶ 89.  Because the statutory maximum term of imprisonment for

the investment advisor fraud count (Count One) is 60 months' imprisonment, the stipulated

Guidelines sentence is 60 months' imprisonment.  PSR ¶ 89.  The applicable fine range is

$30,000 to $300,000.  PSR ¶ 97.  The parties stipulated that although no departures to the

Guidelines are warranted, either party may seek a sentence outside of the stipulated advisory

range based on the factors contained in 18 U.S.C. § 3553(a).  *See* Plea Agreement at 4.

### B.    **The 3553(a) Factors**

Title 18, United States Code, Section 3553(a) represents a broad command to consider

the nature and circumstances of the offense and the history and characteristics of the defendant.

*Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007).  The Court must consider each of those

factors in fashioning a sentence that is sufficient, but not greater than necessary to comply with

---

[4] The Government and initial disclosure of the PSR have also implied that the Cayman Fund made an improper payment to Mr. Lu of $10 million.  That payment was meant for Mr. Lu to represent the Cayman Fund in any necessary proceedings in accordance with section 55.2 in the Cayman Fund's Amended and Restated Memorandum and Articles of Association Adopted by Special Resolution dated August 3, 2020, which Mosaic approved and agreed to be subordinated to each time they subscribed and redeemed to the Cayman Fund.  When it became apparent that Mr. Lu would not represent the Cayman Fund, he returned the money and so the transfer caused no harm to investors.

those statutory objectives.  18 U.S.C. § 3553(a).  Those factors include the history and characteristics of a defendant, the nature and circumstances of the offense, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  18 U.S.C. §§ 3553(a)(1), (2)(A).  They also include the need for the sentence to afford adequate deterrence and to consider the public's need for protection from future crimes, as well as providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a)(2)(B)-(D).  Section 3553(a) further requires the Court to consider the kinds of sentences available and Guidelines range applicable to the defendant ((a)(3) and (4)), and any pertinent policy statement issued by the Sentencing Commission ((a)(5)).  The factors also emphasize the need to avoid unwarranted sentencing disparities among defendants with similar records ((a)(6)).

When weighed and analyzed, the above factors counsel in favor of a sentence of probation with a significant community service component and whatever other conditions the Court feels is appropriate.

### 1.    Mr. Abarbanel's Life and Character Counsel in Favor of Probation

"If ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *United States v. Adel*son, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  Mr. Abarbanel's misjudgment about the scope of adequate disclosures for the Cayman Fund's investors stands in stark contrast to an otherwise exemplary life and career.  18 U.S.C. § 3553(a)(1) requires sentencing courts to consider "the history and characteristics of the defendant."  Mr. Abarbanel made a serious misjudgment, but when his decisions about the disclosures are placed in the

context of his life and his career, that context counsels in favor of a sentence well-below the Guidelines calculation.

In his personal life, Mr. Abarbanel has shown empathy, devotion, and commitment.  As a young man, he pushed himself to be the best tennis player he could be because his parents had instilled in him that pursuing one's passions and striving to be one's best were laudatory goals by themselves.  But, Mr. Abarbanel's true character showed when he, at age 18, was given a choice between his passion—tennis—and completing his military service in Israel.  Mr. Abarbanel took the harder path, but the one that he felt was right. Ex. 1, Abarbanel Personal Statement at 3.  As his mother put it, "[i]f this courageous action, giving up a professional career for the betterment of his country and family, does not describe Ofer's nature as a good-hearted human being, I do not know what will." Ex. 2, Tsvia Letter at 1.

Mr. Abarbanel has shown the same dedication in his support for his family.  When Mr. Abarbanel and Keren became partners, Mr. Abarbanel ensured that Keren had the freedom to pursue her passions, and removed the family from its precarious financial position. Ex. 4, Keren Letter at 1-2.  Keren wrote that he has been "unbelievably supportive" of her, and when Keren became sick he was "by [her] side the entire time." *Id.* at 2-3.  Even when Mr. Abarbanel was arrested, he "spent the entire time writing notes about what [she] needed to do to care for [their] family, things he normally did" because his "only thoughts were of me and the children." *Id.* at 3.

Mr. Abarbanel also became the true father to Keren's two boys.  He was the father figure that Elie felt he was missing and taught Elie "dependability, honesty and the love of learning." Ex. 5, Elie Letter at 1-2.  Elie feels that Mr. Abarbanel is a "selfless" man and "the sole reason that [their] family is still standing and thriving." *Id.* at 2.  Mr. Abarbanel has made OH his "top

priority" and was "always there, at every game, every school event, and every parent teacher conference."  Ex. 6, OH Letter at 1-2.  OH feels that Mr. Abarbanel is an "incredible role model, hard working, honest, and puts family first before anything."  *Id.* at 2.

Mr. Abarbanel's career has likewise been defined by drive, dedication, and service.  Mr. Abarbanel built a successful career in the finance industry in Israel and the United Sates, increasing his expertise step-by-step, founding multiple successful businesses, and overcoming obstacles in his way.  And, prior to the immediate action, at no point in Mr. Abarbanel's long career did anyone ever accuse him of any misconduct.  Instead, at multiple points, Mr. Abarbanel took meaningful steps to ensure alignment between his business's operations and regulatory requirements.

When the financial crisis decimated Mr. Abarbanel's company Contact Management, he spent a year of his life—without compensation—helping Israel to modernize its financial rules and regulations.  *See supra* section III.E.  He recognized a need for Israel to modernize, and he acted with his usual energy and determination to help realize the changes.  And, when Mr. Abarbanel worked to launch Plus Trust, he spent another two years working with NASDAQ and Dechert attorneys to pass a SEC rule change that ensured the business model met regulatory approval.  *See supra* section IV.A.1.b(i).  These were not small, simple undertakings.  They were complicated, time consuming processes, and they were ones that Mr. Abarbanel pursued because they were the right thing to do.  The effort Mr. Abarbanel put into these processes reflects just how aberrant his missteps with the Cayman Fund were.

At least some explanation for the inconsistency between Mr. Abarbanel's long, successful career prior to the Cayman Fund and his misjudgments with the Cayman Fund can be found in his ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ This does not excuse what Mr. Abarbanel did, but it shows

the way in which the lack of judgment he displayed regarding the Cayman Fund disclosures were

not driven by a desire to enrich himself or harm the investors, but, in part, by a ██████████

████████████████████████ And, Mr. Abarbanel wants ████████████████████ so

that it never again leads to such devastating consequences, for him and for the people with whom

he does business.

Moreover, Mr. Abarbanel is the sole provider and source of income for his family.  His

wife Keren cannot work because of her heart condition and back injuries.  Ex. 4, Keren Letter at

3.  Mr. Abarbanel and Keren's friends abandoned them after the Government indicted Mr.

Abarbanel.  Ex. 2, Tsvia Letter at 2.  Mr. Abarbanel and Keren have been able to survive and

stay in their home only because of Mr. Abarbanel's work as a driver, and because of Mr.

Abarbanel's parents, who have depleted all of their savings and have had their house

encumbered in order to support him.  Ex. 2, Tsvia Letter at 3.  Mr. Abarbanel and Keren worry

that without Mr. Abarbanel's support the family will be rendered homeless.  While Mr.

Abarbanel and Keren have amicably separated because of Mr. Abarbanel's devotion to his work,

they still live together and operate as a family unit, and Mr. Abarbanel has every intention of

remaining an integral part of the lives of Keren, Elie, and OH, and of continuing to support them.

A custodial sentence would make Mr. Abarbanel's punishment a punishment for the entire

family.

Mr. Abarbanel brings tremendous energy to everything he does.  It is incredibly important to him to always do well at what he is doing.  This makes the misstatements he made that led to his guilty plea all the more devastating.  Mr. Abarbanel thinks about his decisions every day.  They haunt him because he has "always considered [the investors] loss as [his] loss," and he knows he needs to make amends.  Ex. 1, Abarbanel Personal Statement at 6.  He is "deeply anxious and distressed" over the position in which he has put his family.  *Id.* at 7.  Mr. Abarbanel thrives on being the best that he can be, and for that reason he "will forever be sorry for [his] inexcusable conduct."  *Id.* at 6.  He is devastated and remorseful, and a non-custodial sentence will allow him to start rebuilding what he destroyed.

### 2.  The Nature and Circumstances of the Offense Counsel in Favor of Probation

Mr. Abarbanel made a serious misjudgment about the disclosures provided to investors in the Cayman Fund, and the consequences of that misjudgment will stay with him for the rest of his life.  But it is important to keep Mr. Abarbanel's mistake in perspective.  Investment advisor fraud does not require an individual to act with the intent to harm investors, s*ee United States v. Tagliaferri*, 820 F.3d 568, 573 (2d Cir. 2016) (to be convicted of investment advisor fraud, an investment advisor need not have the intent to harm one's clients), and Mr. Abarbanel indeed never acted with the intent to harm investors.

Mr. Abarbanel made two misrepresentations: 1) that he did not inform investors that the Cayman Fund lent cash at an amount equal to the price of treasuries, instead of purchasing treasuries and lending the treasuries themselves, and that the industry-standard MSLAs had been modified to reflect this practice; and 2) that he closely supervised the securities lending transactions with the Counterparties, and the Counterparties reuse of the collateral.  Those

misrepresentations were made in the context of a prospectus that otherwise described the investment strategy of the Cayman Fund, and the associated risks.

The Prospectus told potential investors that investor funds would be used for securities lending transactions. Ex. 8 (Prospectus at USAO_SDNY_000015796). It disclosed that those transactions carried risks greater than if the Cayman Fund merely bought and held short-term treasuries. *Id.* at USAO_SDNY_000015798. It also disclosed that the Counterparties to the securities lending transactions would engage in collateral reuse, and that collateral reuse carried risks. *Id.* at USAO_SDNY_000015797.

These disclosures gave Mosaic—a sophisticated investor—a real sense of the way in which the Cayman Fund was structured, and what risks investing in it carried. The disclosures simply did not go far enough. The disclosures were not meant to hide or obscure risks so that Mr. Abarbanel could fleece investors and unjustly or disproportionately enrich himself; indeed, Mr. Abarbanel did not even own *any* of the Cayman Fund or the Counterparties. There is a huge gap between an investment advisor whose goal is to steal money for themselves at the expense of clients and an investment advisor who engages in a large fraudulent scheme—*see United States v. Marino*, 309 F. App'x 523, 523 (2d Cir. 2009) (defendant was sentenced to 240 months for organizing a "massive" financial fraud), *United States v. Nicholson*, 638 F. App'x 40, 41 (2d Cir. 2016) (defendant received a 40 year sentence for defrauding more than 250 people out of $100,000,000 over the course of six years), *United States v. Eberhard*, No. 03 CR. 562-01 (RWS), 2005 WL 1384038, at *1 (S.D.N.Y June 9, 2005) (defendant was sentenced to 151 months imprisonment for "churning" client accounts over the course of ten years and making himself millions in the process)—and an investment advisor who tries to do the right thing, but gets it wrong and makes unlawful mistakes. Mr. Abarbanel falls in the latter category.

Mr. Abarbanel's extensive reliance on attorneys also demonstrates that, at the outset, his intent was for the entire operation to be lawful and to provide investors with adequate disclosures.  Mr. Abarbanel spent two years and thousands of hours working with attorneys from Dechert to ensure that the disclosures for the Plus Trust were correct, and spent even more time working with NASDAQ on the rule change that would ensure the Plus Trust fund's structure was within regulatory bounds.  *See supra* section IV.A.1.b.  He likewise spent hundreds of hours working with attorneys from Thompson Hine to ensure that the disclosures for State Funds were accurate.  *See id.*  And, he relied on Robert Lu and Kanika Green to advise him about the disclosures for the Cayman Fund.  *See id.*  Mr. Abarbanel's reliance on counsel faltered when, over the course of several years, he relied on different attorneys' advice for different funds.  This uneven reliance on attorneys created gaps, which he knowingly failed to fill and resulted in inadequate disclosures.

Ultimately, Mr. Abarbanel understood that it could be important and material to an investor to know that the Cayman Fund lent cash and not treasuries and used a modified MSLA, even though the structure of the Fund was proper and lawful; Mr. Abarbanel understood that it could be important and material for an investor to know that he supervised the Counterparties collateral reuse, even though the arrangement was never designed to unjustly enrich himself in any way or violate any duty or obligation.  But Mr. Abarbanel decided that he did not want to overcomplicate the information to be considered by investors, and he took shortcuts, sadly unlawful ones.  Mr. Abarbanel was confident in the Cayman Fund's ability to earn enhanced returns, and he thought ultimately his failure to disclose everything would not matter.  Mr. Abarbanel was wrong, but he never intended to hurt the Cayman Fund's investors.  He

recognizes that depriving them of complete information did just that, and despite only intending to make money for his investors, he was wrong and his conduct unlawful.

3.     **A Probationary Sentence Fulfills the Sentencing Objectives Set Forth in 18 U.S.C § 3553(a)(2)**

a.     **A non-custodial sentence of probation with a substantial community service requirement reflects the seriousness of the offense, promotes respect for the law, and provides just punishment**

Any sentence that the Court imposes must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  18 U.S.C. §§ 3553(a)(2)(A).  A non-custodian sentence fulfills these goals.  In part this is because probation is not "an act of leniency."  *See Gall*, 552 U.S. at 44.  Instead, "probation is . . . . a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing . . . ."  *United States v. Brady*, No. 02-CR-1043 (JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (quoting *U.S. Guidelines Manual*, ch. 5, pt. B, introductory cmt.).

A sentence of probation coupled with extensive community service and whatever other conditions the Court feels are appropriate would represent a profound punishment for Mr. Abarbanel.  Indeed, Mr. Abarbanel's punishment has already begun.  His career, which he spent decades building, has been destroyed, and his reputation left in tatters.  He has caused profound harm to his family, when his greatest intention was to help them.  He has been forced to rely on his parents for financial support, and they have depleted all of their savings and have had their house encumbered in order to support him.  Ex. 2, Tsvia Letter at 3.  Mr. Abarbanel's wife's health has deteriorated considerably due to the stress the proceedings have placed on Mr. Abarbanel and the family.  Both of Keren and Mr. Abarbanel's boys show signs of emotional distress from the case.  PSR ¶ 69.  The entire family worries that without Mr. Abarbanel they

will be homeless.  Mr. Abarbanel spends every day in fear of the "destruction of [his] family."

Ex. 1, Abarbanel Personal Statement at 7.  A sentence of probation would extend this

punishment, but would also allow Mr. Abarbanel to care for his family and start to rebuild his

life.  *See* PSR ⁋ 106 (noting that Mr. Abarbanel's family responsibilities may be a variance factor

for the Court to consider).

Courts should also carefully consider the collateral consequences of their decisions.

Judge Frederick Block has written that, "[i]t is difficult to see how a court can properly calibrate

a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United

States v. Nesbeth*, 188 F. Supp. 3d 179, 187 (E.D.N.Y. 25, 2016).  This is because, "the collateral

consequences of a felony conviction form a new civil death" as "[c]onvicted felons now suffer

restrictions in broad ranging aspects of life that touch upon economic, political, and social

rights."  *Id*. at 182.

Once Mr. Abarbanel is sentenced, he will be a convicted felon, stripped of many rights

and forever to bear the stigma that comes from it.  He will be subject to the vast number of

collateral consequences that felons bear.[5]  He will be hampered in rebuilding a career, and in

providing for his family.  Perhaps even more profoundly, Mr. Abarbanel is an immigrant who

became a U.S. citizen in 2021.  The conduct for which he pled guilty occurred prior to his

becoming a U.S. citizen, meaning that he could face denaturalization charges and be forcibly

removed from the U.S., and from his family.  This is not a theoretical or abstract concern: the

PSR makes clear that a U.S. Immigration and Customs Enforcement inquiry is pending.  PSR

⁋ 71.

---

[5] "Remarkably, there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons.  Of those, federal law imposes nearly 1,200 collateral consequences for convictions generally . . . ."  *Nesbeth*, 188 F. Supp. 3d at 184-85 (footnote omitted).

A long sentence of probation, combined with extensive community service, would represent a profound punishment for Mr. Abarbanel, and in punishing him would promote respect for the law.  Such a punishment would also be consistent with Mr. Abarbanel having exercised bad judgment, but never having intended to harm the Cayman Fund's investors.

> **b.** **A custodial sentence is not needed to afford adequate deterrence to criminal conduct**

A prison sentence is not necessary to achieve general or specific deterrence.  The devastating consequences of Mr. Abarbanel's actions on his family, the destruction of Mr. Abarbanel's career, the stigma that he will retain as a felon, the limitations on his participation in civic life as a felon, and his potential denaturalization and expulsion from the U.S. (and his family) sends a strong message of deterrence.

In fashioning a sentence that achieves the goals of general deterrence, it is important to bear in mind the offense conduct.  Any individual similarly situated to Mr. Abarbanel at the time he committed the offense conduct—that is, a finance industry professional considering starting their own fund, or a business professional considering the adequacy of disclosures in a prospectus—could see Mr. Abarbanel receive a non-custodial sentence that nonetheless served as a form of professional death and decide that there are profound consequences to not exercising extreme vigilance when making representations and disclosures about a fund or business.

Mr. Abarbanel's conduct stands in stark contrast to other individuals who have been sentenced for investment advisor fraud and who received lengthy custodial sentences.  In *United States v. Tagliaferri*, the defendant was sentenced for investment advisor fraud, securities fraud, wire fraud, and violations of the Travel Act for orchestrating years-long scheme in which he used client funds to give himself kickbacks, moved money between client accounts to hide losses, and even created fake securities and caused them to be placed in client accounts.  *See* Sentencing

Transcript at 56, *United States v. Tagliaferri*, No. 13 CR 115 (RA) (S.D.N.Y Feb. 13, 2015),
ECF No. 140.  Even then, with a guidelines range of 210 to 262 months, the court thought a
sentence of 72 months was sufficient.  *See id.* at 79-82.  In *Jamieson v. Sec. Am., Inc.*, No. 19 CV
1817 (VB), 2019 WL 6977126 (S.D.N.Y. Dec. 20, 2019), Hector May was sentenced for
conspiracy to commit wire fraud and investment advisor fraud for running a Ponzi scheme for
more than 20 years in which he defrauded families out of their life savings.  *See* Sentencing
Transcript at 42, *United States v. May*, No. 18 CR 880 VB (S.D.N.Y July 31, 2019), ECF 40.
With a Guidelines range of 188 to 235 months he received a sentence of 156 months.  *See id.* at
44-45.  Or, in *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) the defendant was sentenced for
investment advisor fraud, mail fraud, wire fraud, securities fraud, and money laundering for
running a scheme in which he took advantage of unsophisticated investors and used client funds
for his personal expenses.  *See United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041,
at *1 (S.D.N.Y. Apr. 4, 2007); Sentencing Transcript at 64, *United States v. Vilar*, No. 05 CR
621 (S.D.N.Y. Feb. 5, 2010), ECF No. 956-5.  With a Guidelines range of 210 to 262 months, he
was sentenced to 108 months.  *See id.* at 26, 66.

These cases demanded substantial (but still substantially-below Guidelines) custodial
sentences because these individuals ran long-term schemes that—particularly in the case of
Ponzi schemes—were designed to defraud the investors, permanently depriving them of their
money.  In contrast, for much of its existence, the Cayman Fund earned the enhanced returns that
were its goal and there is no basis to conclude that it would not have succeed in doing so.  Mr.
Abarbanel made discrete misjudgments regarding whether a subset of facts about the Cayman
Fund needed to be disclosed.  Depriving investors of material information they need to make
investment decisions is no small thing, but it is a far cry from the types of investment advisor

fraud that yielded lengthy custodial sentences.  The purpose of general deterrence would be served by imposing a sentence that recognized the vast different between the above-highlighted cases and Mr. Abarbanel's conduct.

Specific deterrence also does not require a custodial sentence, because a number of circumstances ensure that Mr. Abarbanel will never again commit a business (or any) crime.  Mr. Abarbanel attempted to follow his counsel's advice regarding the Cayman Fund disclosures.  *See supra* section IV.A.1.b.  His error in relying on the opinions of attorneys cobbled together over a number of years is not one he will repeat.  Instead, he now has a far more complete, nuanced understanding of the way in which lawyers can and should advise him in any business dealings.  Mr. Abarbanel's lack of a prior criminal record demonstrates that his lapse in judgment was an aberration in an otherwise law-abiding life and career.  ███████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████   And, Mr. Abarbanel has demonstrated clear remorse for his actions.  PSR ⁋ 45.  The losses that his misjudgment caused his investors haunt him; he was driven to succeed for his investors, and this case represents a profound failure to him.  Courts in such circumstances impose downward variance sentences.  *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (granting variance based in part on aberrant nature of insider trading offense and fact that the defendant was "unlikely to repeat his transgressions").  Mr. Abarbanel's regret, lack of prior record, and the aberrational nature of his conduct mean that the public is not at further risk of Mr. Abarbanel committing any crimes.

V.      **CONCLUSION**

Mr. Abarbanel is a good man who exercised bad judgment.  As a convicted felon, he will forever bear the burden of his errors, and he will live with regret and remorse for the rest of his life.  He harmed his family and destroyed a career he had spent his entire adult life building.  But, a custodial sentence will serve no positive purpose.  Mr. Abarbanel is already being punished, and even if he is not incarcerated he will continue to be punished.  He did not act with the intent to harm investors in the Cayman Fund, and spent substantial efforts trying to do the right thing, even if he failed in the end.  He suffered from ███████████████████████ at the time of the crime, and treatment will help address symptoms that contributed to his misjudgment.  And, his errors were discrete ones, and constitute aberrations in an otherwise exemplary life and career.  Mr. Abarbanel is ready to use his incredible energy to make amends to the investors and to rebuild his life.  A non-custodial sentence will allow him to begin taking those positive steps right away.  We therefore respectfully request that the Court impose a non-custodial sentence of probation, with a substantial community service requirement, and whatever other conditions the Court feels is appropriate.

Respectfully submitted,

February 22, 2023
New York, New York

**CROWELL & MORING LLP**

*/s/ Glen G. McGorty*
Glen G. McGorty
Nimi H. Aviad
Jeffrey M. Severson
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
Tel: (212) 223-4000
GMcGorty@crowell.com
NAviad@crowell.com
JSeverson@crowell.com

*Attorneys for Defendant Ofer Abarbanel*

37