UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

                             :

UNITED STATES OF AMERICA       :

                             :     21 Cr. 532 (LAK)

            -  v.  -          :

                             :

OFER ABARBANEL,           :

                             :

                    Defendant.   :

                             :

-------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Allison Nichols
Assistant United States Attorney
     *- Of Counsel -*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 2

    STATX ........................................................................................................................ 2

    The Fund .................................................................................................................... 2

    The Redemption Request ........................................................................................... 4

PROCEDURAL HISTORY ................................................................................................ 5

THE DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT ....................... 7

DISCUSSION ................................................................................................................. 11

    Applicable Law ....................................................................................................... 12

    The Seriousness of the Offense ............................................................................... 12

    Deterrence ............................................................................................................... 14

CONCLUSION ............................................................................................................... 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of Ofer Abarbanel ("Abarbanel" or the "defendant"), scheduled for March 8, 2023.   Abarbanel was an investment adviser who used his experience in the financial and securities industry to fraudulently induce investors to place investments in mutual funds he controlled, in particular the "Income Collecting 1-3 Months T-Bills Mutual Fund" (the "Fund") registered in the Cayman Islands.   Abarbanel lied to investors about how the Fund would operate, including the investments the Fund would make and how securities lending transactions would be collateralized.   Abarbanel also withheld material information from investors, including the fact that he controlled various counterparties who transacted with the Fund.   As a result of Abarbanel's deceptions, investments in the Fund were significantly riskier than Abarbanel had represented and thus riskier than investors understood.   When the Fund's largest investor (the "Investor Group") sought redemption of its shares, Abarbanel admitted that he did not have sufficient funds to redeem those shares, and, when he failed to convince the Investor Group to reinvest with him in lieu of redeeming their shares, began throwing up roadblocks to the redemption request.

The total loss amount is $106 million, of which approximately $85 million was returned to the Investor Group as part of the Fund's liquidation process.[1]   In order to reflect the seriousness of the offense and deter others from engaging in similarly deceptive activity, the Court should impose a term of imprisonment consistent with the recommendations of both the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") and the United States Probation Office of

---

[1] The Government anticipates submitting a proposed restitution order and preliminary forfeiture order in connection with sentencing.

60 months.  Such a sentence would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## **BACKGROUND**

Abarbanel worked in the securities industry, including in both the United States and Israel, for most of his professional career.  (*See* Presentence Investigation Report ("PSR"), Dkt. No. 64, ¶ 9).  Abarbanel's relationship with the Investor Group that was the victim of his fraud in this case dates to 2016, when he solicited the principal of the investment adviser to the Investment Group (the "Principal") to invest funds of the Principal's investment advisory clients in a now-deregistered mutual fund Abarbanel controlled that traded under the NASDAQ symbol STATX. (PSR ¶¶ 10, 13, 17).

*STATX*

STATX employed a similar investment strategy as the Fund at issue in this case, namely the purchase of U.S. treasury securities, securities lending, and certain other short-term loan transactions known as repurchase or reverse repurchase agreements.  (PSR ¶¶ 17, 18).  As to the securities lending transactions, Abarbanel represented that STATX, through a custodian, would take possession of collateral that could be liquidated or refinanced in the event of a default.  (*Id.*) The investment risk associated with these transactions was therefore limited to a possible decrease in the value of the collateral as opposed to the financial position of the counterparty to the transaction.  (*Id.*).  Based on these and other representations, the Principal invested approximately $20 million of his investment advisory clients' funds in STATX.  (PSR ¶ 17).

*The Fund*

In late 2018, Abarbanel told the Principal that he was closing STATX and opening the Fund, which he represented would have the same or similar investment strategy—so similar, in fact, that he referred to the new Fund as "STATX offshore."  (PSR ¶ 18).  Abarbanel told the

2

Principal that he wanted to substitute the Fund, which was to be registered in the Cayman Islands, for STATX to avoid certain regulatory fees.   (PSR ¶¶ 8, 18).   After receiving the prospectus for the Fund and receiving the redemption of the STATX investments made on behalf of his clients, the Principal agreed to invest in the Fund on behalf of his clients, ultimately investing approximately $190 million.   (PSR ¶¶ 19, 26).

The Fund's prospectus described its investment objective as "seeking current income with preservation of capital and daily liquidity" (PSR ¶ 20)—in other words, a stable, highly liquid investment with low returns balanced against low risk.   The Fund's investments were to be placed "primarily" in U.S. Treasury securities with maturities of between one and three months.   (*Id.*). Contrary to that representation, most of the Investor Group's funds were not invested in short-term treasuries.   Instead, Abarbanel and others working at his direction transferred investor funds to counterparties controlled by or closely associated with Abarbanel.   (PSR ¶ 14).

The Fund's prospectus disclosed that to enhance income, the Fund would enter securities lending transactions that would be fully collateralized or over collateralized.   (PSR ¶¶ 15, 21). The prospectus further provided that "[t]he Fund seeks to protect against securities lending risk through, among other things, over-collateralization requirements and contractual provisions which provide for the right to liquidate collateral promptly in the event of default." (PSR ¶ 23). However, contrary to representations both made in the prospectus and also made by Abarbanel directly and repeatedly to the Principal, the Fund did not obtain possession of collateral in connection with these securities lending transactions.   Instead, the Fund and the counterparties executed unsecured and uncollateralized loan agreements.   (PSR ¶¶ 24, 28, 34-36).   Abarbanel's decision to forego obtaining the collateral described in the prospectus made these securities lending transactions materially different than what was described in the prospectus and, in particular,

3

significantly riskier than what investors understood and agreed to when they decided to invest. (PSR ¶ 17).   Furthermore, Abarbanel never disclosed to investors that he controlled or was otherwise closely associated with the counterparties involved in these securities lending transactions.  (PSR ¶¶ 22, 28-33).  In other words, rather than engaging in arms-length, fully collateralized or over-collateralized securities lending transactions with third parties, as he had promised investors, Abarbanel caused investor money to be transferred to counterparties he secretly controlled in exchange for an unsecured and uncollateralized loan agreement.

*The Redemption Request*

After the SEC issued a subpoena to Abarbanel seeking records related to the Fund, Abarbanel forcibly redeemed all share classes except GOVBX, the share class in which the Investor Group had invested, and which constituted the overwhelming majority of the Fund's assets.  (PSR ¶ 38).  A few days later, in early March 2021, the Investor Group submitted a redemption request for $75 million by, consistent with prior redemptions, filling out a redemption request form available on the Fund's web site, which the Fund honored.  (PSR ¶ 39d n.6). Approximately two months later, on May 21, 2021, the Investor Group requested a full redemption of its shares, which amounted to approximately $106 million.  (PSR ¶ 39a).  Abarbanel refused to honor the redemption request.   Instead, he proposed that the Investor Group redeem its shares in the Fund and reinvest them with Abarbanel in a different investment vehicle, rather than obtaining a full return of the investment in cash.  (PSR ¶ 39b-c).   In a PowerPoint presentation that Abarbanel and the Fund, through counsel, sent the Investor Group on May 27, 2021, Abarbanel admitted that a full redemption was not possible because not all the Investor Group's funds were available, claiming that the Fund was holding approximately $89 million in cash and

an additional $26 million in cash and treasuries tied up in lending agreements and not able to be liquidated.   (PSR ¶ 39b).

When the Investor Group declined Abarbanel's offer to reinvest with him instead of seeking a full redemption, Abarbanel began making additional demands, including requiring that the Investor Group identify for him the net worth and identity of beneficial owners and imposing other conditions that he claimed were related to "money laundering" protocols.   (PSR ¶ 39d).   On June 1, 2021, Abarbanel told the Investor Group, through its counsel, that the Investor Group would need to sign a new agreement under which the Investor Group's redemption request would be satisfied by assigning it to the counterparties' accounts and "future cash flow" from the Fund's lending agreements with the counterparties—still without disclosing Abarbanel's control of the counterparties.   (PSR ¶ 39e).   While the Investor Group's redemption request was still pending and though Abarbanel had already admitted that the Fund did not have sufficient resources to satisfy the redemption request, the Fund wired $10 million to the personal brokerage account of one of the Fund's attorneys.   (PSR ¶ 40).

## PROCEDURAL HISTORY

Abarbanel was charged by complaint 21 Mag. 6425 and arrested in Los Angeles on June 24, 2021.   On August 23, 2021, the grand jury returned Indictment 21 Cr. 532.   The Indictment charged Abarbanel with the same crimes set forth in the Complaint, namely, securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.l0b- 5, and 18 U.S.C. § 2; and wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

On September 7, 2022, Abarbanel pled guilty before Magistrate Judge Ona T. Wang to a one-count superseding information (the "Information") charging him with investment advisor fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17 and 18 U.S.C. § 2.   During his plea allocution, Abarbanel acknowledged:

> From approximately 2018 to approximately June 2021, I advised various investors and prospective investors and communicated with those individuals using the mail and through other interstate communications like e-mail.
>
> In connection with the prospectus for the Income Collecting 1-3 Months T-Bills Mutual Fund, I willfully and knowingly omitted certain material information from the prospectus, rendering the prospectus misleading. I knew I was wrong to deprive them of this information when making their investment decision.

(Plea Tr. 26).   Abarbanel further acknowledged that he knew what he was doing was against the

law.   (Plea Tr. 27).   The Government proffered a lengthier recitation of proof relevant to the case,

to which the defendant did not object.   (Plea Tr. 23-26).

The parties and the U.S. Probation Office agree as to the correct calculation of the

applicable Guidelines sentence in this case.   The applicable Guideline is U.S.S.G. § 2B1.1, and

pursuant to Section 2B1.1(a)(2), the base offense level is six.   (PSR ¶ 5).   Because the loss from

the offense was greater than $9,500,000 but less than $25,000,000, 20 levels are added.   (*Id.*).

Because the offense involved sophisticated means and the defendant intentionally engaged in or

caused the conduct constituting sophisticated means, two levels are added.   (*Id.*).   A further four

levels are added because the offense involved a violation of securities laws and the defendant was

an investment advisor or associated with an investment advisor at the time of the offense.   (*Id.*).

A three-point reduction is warranted for the defendant's acceptance of responsibility pursuant to

U.S.S.G. § 3E1.1(a).   (*Id.*).   The defendant has no known criminal history.   Accordingly, the

Guidelines range would be 87 to 108 months of imprisonment, but because the statutory maximum

term of imprisonment is 60 months, the stipulated Guidelines sentence is the statutory maximum

sentence of 60 months of imprisonment.   (*Id.*).   Through its supplement to the PSR, the Probation

Office has recommended a Guidelines sentence of 60 months' incarceration.   (PSR at 31).   The

PSR's recommendation is based on the "significant financial losses to investors, who are unlikely to

6

recoup their substantial losses" and takes into account that the applicable statutory maximum term of imprisonment has already given the defendant a significant break compared to the otherwise-applicable Guidelines range calculation.   (*Id.* at 32).

### THE DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

Abarbanel raised a number of objections to the preliminary presentence investigation report, most of which have been resolved by the Probation Office.   (PSR at 25-29).   Broadly, the defendant's objections do not constitute factual disputes that need to be resolved by the Court prior to sentencing, but rather requests for the inclusion of supplemental information the defendant appears to believe would give favorable context to his offense conduct and argument as to the appropriate inferences that may be drawn from the facts.   To the extent the defendant continues to press his remaining objections,[2] the Government respectfully submits that they can be resolved by the Court without further fact-finding.

For example, Abarbanel objects to the PSR's characterization of the Fund as part of a "scheme to defraud investors."   The Government understands this objection to be, rather than a factual objection, an argument in mitigation about Abarbanel's intentions and mental state. Because Abarbanel pled guilty to investment adviser fraud, which concerns "devices, schemes, and artifice to defraud," and because he acknowledged in his guilty plea allocution that he "willfully and knowingly omitted certain material information from the prospectus, rendering the prospectus misleading" and that he knew it was "wrong to deprive [investors] of this information when making their investment decision" (Plea Tr. 26), the Government respectfully submits that Abarbanel's objection should be overruled.   The Court may consider Abarbanel's argument about

---

2 Abarbanel filed his sentencing submission the day before the Probation Office filed its final Presentence Report, and, accordingly, Abarbanel's submission did not address the Probation Office's resolution *vel non* of his objections.

his mental state—as well as any inference the Court may choose to draw about Abarbanel's degree of acceptance of responsibility—as part of the Section 3553(a) factors, as described further below.

In several places, Abarbanel objects to the PSR's description of how securities lending transactions were collateralized or supposed to be collateralized, asserting that he believed that obtaining rights in the collateral, as opposed to the collateral itself, was consistent with the prospectus and that the disclosures in the prospectus were vetted and approved by his attorneys. (Dkt. No. 63, Defendant's Sentencing Memorandum "Def. Mem." 20, 24).[3]   In support of his assertion that he relied on advice of counsel in crafting the language in the prospectus concerning how securities lending transactions would be collateralized, Abarbanel submitted hundreds of pages of material, consisting of correspondence with outside counsel to a previous fund not at issue in this case and that fund's prospectus (Def. Ex. 12); an email from the "operations team" at the Fund updating counsel about contact information for the Fund's money laundering reporting officer and anti-money laundering compliance officer and attaching the Fund's prospectus (Def. Ex. 13); and text messages and an email between Abarbanel and the Fund's general counsel indicating that the general counsel had reviewed the Fund's prospectus.  (Def. Ex. 14-15).  The Government respectfully submits that these exhibits do not meaningfully illuminate the defendant's state of mind concerning whether the prospectus accurately described the structure and risk associated with the Fund's securities lending transactions, nor do they suggest that counsel blessed the specific language in the prospectus *while knowing and understanding* that Abarbanel was actually structuring the transactions differently.  *See generally United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) ("[T]o benefit from an advice-of-counsel defense, a party must show that he (1) honestly and in good faith sought the advice of counsel; (2) *fully and honestly*

---

[3]  Page numbers refer to the pagination in the ECF-generated headings.

*laid all the facts before his counsel*; and (3) in good faith and honestly followed counsel's advice.") (internal quotations omitted) (emphasis added).   However, the Court may consider these exhibits, as well as Abarbanel's argument in mitigation, for whatever relevance they may have to Abarbanel's mental state, including whether the argument bears on Abarbanel's degree of acceptance of responsibility.   The Government does not understand Abarbanel to raise a factual dispute about how the prospectus described the securities lending transactions, how the transactions were in fact structured and collateralized, or whether the difference was material to the Investor Group,[4] and, accordingly, respectfully submits that any objection should be overruled.

Finally, Abarbanel objects to the description of the Fund's refusal to honor the Investor Group's redemption request, arguing that it is "not germane to the actual conduct" to which he pled guilty and that "the facts do not support" an inference that the refusal was pretextual or otherwise constituted wrongdoing.   (Def. Mem. 26).   The Government respectfully submits that this is not a dispute regarding the factual recitations in the PSR, but rather a dispute about the inferences the Court can or should draw from those facts.   Abarbanel has submitted additional facts, argument, and exhibits from which he asks the Court to conclude that the Fund resisted the redemption request only on the advice of counsel and because of legitimate concerns that the Investor Group had failed to provide accurate information about its beneficial owners.   (*Id.* 26-28; Def. Ex. 16-22).[5]   The Court is free to consider these supplemental facts and argument, but

---

[4] The Government understands from counsel to the Investor Group that it intends to submit a victim-impact letter in advance of sentencing.   The Government will promptly file any such letters it receives and will advise the Court if it learns that the victim wishes to be further heard in person at the sentencing proceeding.

[5] The email that Abarbanel attached as Defense Exhibit 19 is extremely misleading.   Abarbanel misleadingly and incorrectly suggests that the individual "Lourdes" was an investor whom the Investor Group wanted to hide from Abarbanel.   To the contrary, and as Abarbanel well knows, Lourdes was a broker-dealer who had worked with Abarbanel in the past but had a falling-out with

the Government respectfully submits that the reasonable conclusion for the Court to draw is that Abarbanel threw up roadblocks to the Investor Group's redemption request, because he knew that sufficient funds were not available to fully redeem the Investor Group, and he wanted to buy time.

A few days after the Investor Group first requested a full redemption, Abarbanel attempted to pitch the Investor Group on a new investment vehicle to be set up by Abarbanel, under which the Investor Group could redeem their shares in the Fund if they were to reinvest with Abarbanel instead of taking their full redemption in cash.  (PSR ¶ 39c).  During the course of that pitch, Abarbanel admitted, in writing, that a full redemption of the Investor Group's approximately $106 million was not possible because the Fund was holding only approximately $89 million in cash, while an additional $26 million in cash and treasuries were tied up in lending agreements that could not be liquidated.  (PSR ¶ 39b).  This latter representation appears to be entirely false— there was not an additional $26 million in cash and treasuries tied up in lending agreements but available to be wound down at a later date or redeemed in-kind; rather, that is the approximate amount of the Investor Group's money that Abarbanel lost, whether by misappropriating the funds, diverting them to counterparties or other parties not authorized by the prospectus, engaging in risky transactions that did not pan out, or using the Investor Group's funds to redeem shareholders in other share classes (PSR ¶ 38), or some combination thereof.

---

him and did not want to work directly with him in the future.   Lourdes was not an investor in the Fund.   Moreover, the conversation in Defense Exhibit 19 did not even concern the Fund, but rather ongoing discussions that the Investor Group was having with Abarbanel about forming a new, different offshore fund, which never came to fruition.   Lourdes was interested in working with the Investor Group on that new fund but did not want to work directly with Abarbanel or even for Abarbanel to know of her involvement because of her personal issue with him.   Dozens of documents and emails with and concerning Lourdes and concerning the proposed new offshore fund were produced in discovery, and the Government can supply the Court with the relevant documents upon request.

The Court can consider Abarbanel's suggested inference—that he and his counsel had legitimate concerns that the Investor Group "hid the identity of its investors from the Cayman Fund" (Def. Mem. 27)—in light of the full factual context.  This includes that Abarbanel tried and failed to persuade the Investor Group to reinvest with Abarbanel, that Abarbanel had honored a redemption request from the Investor Group just weeks before, that the Investor Group's funds were not available and even now have not been fully recovered, and that one of the new conditions Abarbanel demanded is that the Investor Group sign a new agreement under which their request would be satisfied by assigning it the counterparties' accounts and "future cash flow" from the Fund's lending agreements with the counterparties (a totally circular proposal in light of the fact that the counterparties were controlled by Abarbanel and their cash flow came from their lending agreements with the Fund).  The full factual context also includes the Investor Group's long history with Abarbanel, dating back to 2016, in which Abarbanel had never sought the additional requirements prior to redemption or expressed any concern about the Investor Group's beneficial owners or compliance with money laundering protocols, including when the Investor Group fully redeemed from STATX in order to reinvest with the Fund.

## DISCUSSION

The Government recommends that the Court impose a Guidelines sentence of 60 months' imprisonment.  Such a sentence is necessary to meet the statutory ends of sentencing, including just punishment, general deterrence, and promoting respect for the law.  The Probation Office likewise recommends a 60-month sentence, while the defendant is seeking a non-custodial sentence.  For the reasons that follow, such a sentence would not fully reflect the seriousness of the offense and would fail to meet the goal of specific and general deterrence.

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a).   While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory."   *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).   "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."   *Id.* at 188.   "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense."   *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

This case involves a massive, sophisticated fraud that resulted in a net loss of approximately $20 million to the Investor Group, investors to whom Abarbanel owed a fiduciary duty and whom he deliberately deceived.   Abarbanel's deceit induced investors to make investing decisions that were not meaningfully informed, and thus not in their best interest.   Abarbanel's misrepresentations to the Investor Group about how the Fund would operate and the risks that would apply to the securities lending transactions were particularly harmful, as the Principal to the Investor Group chose Abarbanel's Fund on behalf of his clients to fulfill a specific investment strategy seeking a low risk, low return investment balanced with the flexibility of daily liquidity.

Abarbanel's departure from the representations in the prospectus was neither a minor nor an aberrant occurrence but rather part of a years-long course of conduct in which he deliberately, repeatedly lied and withheld material information from investors.   Abarbanel repeatedly

reassured the Principal that the Fund's investments were safe because its transactions were fully collateralized.   One such written reassurance is summarized in the presentence report:

> In November 2020, the Principal asked ABARBANEL how a different investment fund compared with GOVBX. ABARBANEL replied, that the other investment was inferior because "their repo activity is allowed to be collateralized by JUNK bonds!!!" The Principal understood this comment as ABARBANEL contrasting the poor collateral offered by the other fund with the safe and liquid U.S. Treasury collateral obtained by the Fund in its transactions.

(PSR ¶ 27).   In a similar email approximately a year earlier, attached here as Exhibit A, the Principal sent Abarbanel an article written by a friend of the Principal discussing, among other things, risks inherent in repurchase agreements, including that

> [t]he primary risk to the lender is counterparty risk, meaning that if Party 1 and Party 2 enter into an agreement and Party 2 defaults, Party 1 loses money. Party 2 may have posted collateral, but that collateral could become worthless if Party 2 goes bust, or if someone Party 2 loaned money to goes bust. Ultimately, if you lend money to your brother and he defaults, you're screwed. Even though collateral is posted, there may be unknown risks to that collateral.

(Ex. A at 3).   The Principal sought Abarbanel's views, and Abarbanel replied, in relevant part:

> We limit our collateral to only plain US Treasuries with maturity of up to 2 Years since even if US Treasuries drop in value to zero and never recover back to their normal price, their redemption is GURANTEED [sic] by the US Government back to full value of $100 per US Treasury thus, the investor loses only time waiting for the full redemption of up to 2 years until the collateral matures and paid by the US Government and this way the investor doesn't lose money.

(Ex. A at 1) (emphasis omitted).   In other words, Abarbanel not only failed to adequately disclose the true structure and risk of the Fund's investment activities in a prospectus reviewed by his attorneys, he repeatedly promoted a false and misleading narrative that the Fund's securities lending transactions were fully collateralized by U.S. treasury securities.   The Court should reject Abarbanel's attempts to minimize his betrayal of investors' reliance, which took place over a

period of years and resulted in a massive financial loss.   Tellingly, Abarbanel has not grappled with that loss at all, and makes no attempt to explain how his "shortcuts" led to losses of more than $20 million.   (Def. Mem. 35).   Under these circumstances, a non-custodial sentence would be particularly inappropriate, as the sentence imposed must be sufficient to reflect the seriousness of this crime and the danger it imposes to investors.

*Deterrence*

A substantial term of imprisonment is also warranted to promote the goal of general and specific deterrence and the need to protect the public from future crimes of the defendant.   As to the latter two considerations, Abarbanel's sentencing submission demonstrates that he has not fully acknowledged his conduct. Abarbanel attempts to minimize the gravity of his offense by portraying his misrepresentations as minor, technical violations of the express terms of the prospectus.   Abarbanel variously suggests that everything he was doing was above-board and approved by his attorneys and blames the victim, "a sophisticated investor" who had a "real sense of the way in which the Cayman Fund was structured," and the inherent risks, and, presumably, the argument goes, should have known better.   (Def. Mem. 34).   It is difficult to see how Abarbanel can be trusted not to reoffend when he has not fully acknowledged his wrongful conduct.

General deterrence, too, is critical here.   Absent a substantial period of imprisonment, others in Abarbanel's position may make a cost/benefit analysis and conclude that the potential risk of a jail sentence is worthwhile given the money that can be made by deceiving investors.   A non-custodial sentence would send the wrong message to the investing public and is not justified by the facts of this case.   First, the defendant knew what he was doing was wrong; this case did not involve a momentary lapse, but instead involved a planned effort to deceive investors over a

period of years.   Second, Abarbanel himself attempted to double-down on his wrongdoing by seeking to persuade the Investor Group to reinvest with him instead of pursuing their full redemption request.   The public needs to understand that such conduct will be met with meaningful consequence.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to a Guidelines term of 60 months' incarceration.

Dated: New York, New York
        March 1, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                        By:     _____/s/_____
                                Allison Nichols
                                Assistant United States Attorney
                                Tel. (212) 637-2366